#CFC100001659

ORIGINAL

FILED

JAN . 4 2016

U.S. COURT OF
FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

TAYLOR ENERGY COMPANY LLC,　　　*　　CASE NO.

　　　　　　　Plaintiff　　　　　　*

VERSUS　　　　　　　　　　　　　*

　　　　　　　　　　　　　　　　*　　16-12 C

THE UNITED STATES OF AMERICA,　　*

　　　　　　　Defendant　　　　　　*

*　　*　　*　　*　　*　　*　　*　　*

## COMPLAINT

Taylor Energy Company LLC ("Taylor") files the following Complaint, through its undersigned counsel, against the United States of America and states as follows:

## PARTIES

1.

Plaintiff, Taylor, is a Louisiana limited liability company with its principal place of business in Orleans Parish, Louisiana. Its only member is Phyllis M. Taylor, a Louisiana citizen domiciled in Orleans Parish. Prior to the sale of substantially all of Taylor's assets during 2008, Taylor's principal business was in the exploration, development and production of oil and gas on the Outer Continental Shelf ("OCS") in the Gulf of Mexico.

2.

Defendant is the United States of America, acting by and through the Department of the Interior ("DOI"), DOI's Bureau of Ocean Energy Management ("BOEM") and its Bureau of Safety and Environmental Enforcement ("BSEE"),[1] including their officers, employees and

---

[1] The predecessor to BOEM and BSEE is the Minerals Management Service ("MMS") of the DOI. From mid-June 2010 to October of 2011, DOI renamed MMS the Bureau of Ocean

agents (collectively, "the Government"). DOI has supervisory and management responsibility over BOEM and BSEE, which, pursuant to the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 *et seq.* ("OCSLA"), have responsibility for implementation and application of the federal laws, regulations and policies at issue in this Complaint.

## THE SUBJECT MATTER OF THE COMPLAINT

3.

The Government has breached a Trust Agreement, dated March 19, 2008, with Taylor. Under the Trust Agreement, Taylor agreed to place approximately $666 million of Taylor's funds into a Trust Account, subject to the Government's authorization of reimbursement of the funds to Taylor in designated amounts upon Taylor's completion of certain specified obligations to decommission wells and facilities on an oil and gas lease located at Mississippi Canyon Block 20 in the Gulf of Mexico on the OCS. Notwithstanding that the Trust Agreement has been in effect for over seven years and despite Taylor's completion of the last decommissioning obligation the Government authorized it to undertake under the Trust Agreement over four years ago, the Government recently informed Taylor in writing and publicly disclosed that its position is that the term of the Trust Agreement is indefinite and that Taylor's performance of the remaining decommissioning obligations under the Trust Agreement will occur, if at all, only at some uncertain and indeterminable future date. The Government has also informed Taylor that it intends to withhold indefinitely all of Taylor's funds that remain in the Trust Account, a sum of approximately $432 million.

---

Energy Management, Regulation and Enforcement ("BOEMRE"). On October 1, 2011, DOI replaced MMS with BOEM and BSEE.

4.

Under Louisiana law, which expressly applies to the Trust Agreement, the term for performance of a contract cannot be indefinite. Instead, Louisiana law mandates that, when the term for the performance of a contract obligation is not fixed or determinable, the contract must be performed within a reasonable time. La. Civ. Code art. 1778. By failing to allow Taylor's performance of the remaining decommissioning obligations under the Trust Agreement within a reasonable time, the Government breached the Trust Agreement. The Government's breach entitles Taylor to the return of its funds that remain in the Trust Account.

5.

When Taylor and the Government entered into the Trust Agreement in 2008, they could not have reasonably foreseen that Taylor's performance of decommissioning activities to plug and abandon sixteen of twenty-five wells and to remove contaminated soil from the seafloor, which are specific decommissioning activities required under the Trust Agreement, would violate the provision of OCSLA that requires that all decommissioning activities must be performed in a manner that prevents or minimizes occurrences that may cause harm or damage to the human, marine or coastal environment. 43 U.S.C. § 1332(6). Since Taylor and the Government entered into the Trust Agreement in 2008, globally recognized experts have concluded that it is impossible for Taylor to plug and abandon the remaining sixteen wells and remove the contaminated soil from the seafloor while preventing or minimizing occurrences that may cause undue or serious harm or damage to the human, marine or coastal environment. Accordingly, it is impossible for the parties to perform their obligations under the Trust Agreement. Louisiana law therefore requires that the Trust Agreement be dissolved, entitling Taylor to the release of its funds from the Trust Account.

{N3145512.5}

6.

Since entry into the Trust Agreement in 2008, the Government and Taylor have learned and acknowledged that they were mutually mistaken that it is technically possible and more environmentally beneficial than risky for Taylor to perform the removal of contaminated soil from the lease site, which is one of the specific decommissioning obligations required under the Trust Agreement.    They further have learned and acknowledged that they were mutually mistaken that it is more environmentally beneficial than risky for Taylor to perform the plugging and abandonment of the remaining sixteen wells at the lease site, which the Trust Agreement also specifically requires Taylor to perform.  Because those obligations are the only ones that remain to be performed by Taylor and given that the parties mutually erred when they contractually agreed to have Taylor perform them, Louisiana law entitles Taylor to reformation or partial rescission of the Trust Agreement and release of the remaining funds from the Trust Account that are designated for performance of those obligations.

7.

The Government's unilateral imposition of an indefinite term for Taylor's performance of the remaining obligations under the Trust Agreement and its withholding of Taylor's funds in the Trust Account indefinitely constitute a breach of the Government's obligation of good faith and fair dealing under Louisiana law, entitling Taylor to release of its funds remaining in the Trust Account and to recover monetary damages for the harms it has suffered due to the Government's breach.

8.

By this Complaint, Taylor does not seek to be relieved of its legal obligations, and a decision by this Court that grants Taylor its request for the release of its funds held in the Trust

Account would not serve to relieve Taylor of its legal responsibilities. Rather, the release of Taylor's funds would afford Taylor access to those funds so that it could continue its practice of full compliance with its legal responsibilities.

## JURISDICTION

9.

This Court has subject matter jurisdiction over this action pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1). The Tucker Act waives the Government's sovereign immunity and specifically authorizes suits against the Government for monetary damages resulting from its breach of contract.

## GENERAL FACTUAL BACKGROUND

### THE INCIDENT

10.

Taylor was the lessee and operator of: (a) all of a former OCS lease covering Mississippi Canyon Block 20, Lease OCS-G 04935; and (b) part of two former OCS leases covering Mississippi Canyon Block 21 and South Pass Block 73, Lease OCS-G 15459 and Lease OCS-G 15371, respectively, on which a platform, 28 wells and associated facilities were located (collectively, "MC20"). Taylor acquired its interest in the MC20 Lease, which was entered into on December 1, 1981, by assignment from BP Exploration & Oil Inc. ("BP"), effective April 1, 1994. When Taylor acquired MC20, the platform had been installed, and 18 of the 28 wells had been drilled. After its acquisition of the MC20 leases, Taylor drilled an additional ten wells.

11.

On September 16, 2004, Hurricane Ivan, a storm that alternated between a Category 4 and a Category 5 storm as it traveled the Gulf of Mexico, struck MC20 and resulted in a seafloor shift that toppled the MC20 platform, scattered debris on and under the seafloor and caused

hydrocarbon leaks to occur. As a result of the unprecedented seafloor collapse, the platform now lies about 550 feet down slope and southeast from its original location, and the well bores rest in a tangled web buried by an average of 100 feet of mud and sediment. All production at MC20 permanently ceased several days before Hurricane Ivan hit as a result of Taylor's evacuation and shutting-in of the facilities in preparation for the storm.

12.

Of the 28 wells at MC20, three wells had been temporarily abandoned before Hurricane Ivan. The Government subsequently deemed them permanently plugged and abandoned, leaving 25 wells to be decommissioned.

13.

Effective June 28, 2007, the leases at MC20 terminated by relinquishment due to lack of production.

14.

When an OCS lease terminates, the applicable regulations generally require the lease operator to decommission the lease within one year after the lease terminates by permanently plugging the wells and removing the platform and facilities through use of "best available and safest technology." See 30 C.F.R. § 250.1710; 30 C.F.R. § 250.1725; 30 C.F.R. § 250.105; 30 C.F.R. § 250.107; see also 43 U.S.C. § 1347(b). When a lease operator fails to comply with the regulatory deadlines and procedures for lease decommissioning, BSEE may compel compliance through the issuance of notices of noncompliance and the imposition of civil penalties of up to $40,000 per day. See 43 U.S.C. § 1350; 30 C.F.R. § 250.1400 et seq. Further, when an OCS lease terminates, the applicable regulations generally provide for cancellation of the bond submitted to guarantee the lessee's compliance with all lease and regulatory obligations seven years after termination of the lease. 30 C.F.R. § 556.58; see also 30 C.F.R. § 556.54(a)(2).

{N3145512.5}

15.

Under OCSLA, it is the "declared" policy of the United States that OCS operations "should be conducted in a safe manner . . . using technology, precautions, and techniques sufficient to prevent or minimize . . . occurrences which may cause damage to the environment or to property, or endanger life or health." 43 U.S.C. § 1332(6). As a result of this federal policy, governing federal regulations require OCS operators to "[c]onduct all decommissioning activities in a manner that is safe, does not reasonably interfere with other uses of the OCS, and does not cause undue or serious harm or damage to the human, marine, or coastal environment." 30 C.F.R. § 250.1703(f).

16.

Following termination of the leases at MC20, effective June 28, 2007, and consistent with its regulatory practice and procedure, in October 2007, the Government ordered Taylor to permanently plug and abandon all wells at MC20 "within a period of one year" from termination of the leases, by June 28, 2008.

17.

Taylor and the Government, however, subsequently recognized the impossibility of pursuing decommissioning of the wells at MC20 through conventional plugging and abandonment techniques due to the burial of the well bores caused by the seafloor collapse. They therefore agreed to examine alternatives for decommissioning the MC20 wells.

18.

To address the MC20 site, in the fall of 2007, the United States Coast Guard ("Coast Guard") established a "Unified Command," composed of Taylor, DOI and the Coast Guard. *See generally* 40 C.F.R. Part 300.

## THE TRUST AGREEMENT

### 19.

Following the death, on November 5, 2004, of Patrick Taylor, the founder, Chairman, President and Chief Executive Officer of Taylor, Taylor initiated arrangements to sell its assets. In 2008, Taylor completed the arrangements for the sale, selling its oil and gas assets to a joint venture between Korea National Oil Corp. and Samsung Corp., now known as ANKOR Energy LLC. The Government, then acting by and through the MMS[2] of the DOI, withheld approval of the sale, which covered numerous federal OCS leases, absent an agreement with Taylor with respect to the funding and performance of decommissioning activities at MC20.

### 20.

On March 19, 2008, Taylor, as Settlor, entered into a Trust Agreement with the United States of America, acting by and through the MMS of the DOI, as Beneficiary, to perform specific decommissioning operations at MC20. The Trust Agreement specifies that the parties entered into it "to fulfill certain obligations to plug and abandon wells, remove a portion of the platform and facilities, clear the seafloor of obstructions, and take corrective action associated with wells and facilities" at MC20. Trust Agreement, p. 1. The Government drafted the Trust Agreement by use of its model form for such agreements. A copy of the Trust Agreement is attached hereto as Exhibit "1."

### 21.

Pursuant to the Trust Agreement, Taylor placed $666,280,000 into a Trust Account, with JP Morgan Chase Bank, N.A., acting as Trustee.

---

[2] MMS has since been divided into BOEM and BSEE. *See supra* note 1.

22.

The Trust Agreement defines the term "Obligations" to mean "the duties and costs" of Taylor "pertaining thereto to abandon wells, remove the platform and other facilities, clear the seafloor of obstructions, and take corrective action associated with wells as set forth in Schedule A attached hereto arising pursuant to the terms of the Leases and applicable federal regulations related to such Leases." Trust Agreement, § 1.2(d).

23.

Section 5.1 of the Trust Agreement provides that "[i]ndividual costs by well, pipeline, facility, site clearance or any other pertinent obligation categories are described on Schedule A."

24.

Schedule A of the Trust Agreement lists 29 separate activities (the "Obligations") that Taylor was to perform, setting them forth in five categories. Schedule A further provides a cost estimate associated with each Obligation.

25.

The five categories and the estimated costs for the performance of each separate Obligation are:

|  | Activity | Amount | Quantity |
|---|---|---|---|
| (1) | Plug and abandon each of 25 wells | $ 25.5 million per well totaling $637.5 million | 25 |
| (2) | Remove the deck and flare boom from platform A | $ 6.245 million | 1 |
| (3) | Clear seafloor of obstructions | $ 6.535 million | 1 |
| (4) | Remove pipelines | $ 3.0 million | 1 |
| (5) | Remove contaminated soil | $ 13.0 million | 1 |
| | **Total** | **$ 666.28 million** | |

26.

The Trust Agreement requires Taylor to pay for the performance of the decommissioning activities by use of funds outside the Trust Account. After Taylor's performance of an activity, the Trust Agreement entitles Taylor to obtain the release of funds from the Trust Account commensurate with each cost estimate amount upon the Government's acceptance of evidence showing Taylor's completion of the activity or Obligation as set forth in Schedule A. Trust Agreement, § 4.1.

27.

The Government and Taylor subsequently entered into an "Agreement Between Taylor Energy Company LLC and the Minerals Management Service to Implement Article IV – Disbursements of the March 19, 2008 Trust Agreement" ("Disbursement Agreement") regarding the procedure for disbursements from the Trust Account, dated November 20, 2008. In the Disbursement Agreement, the parties agreed to a three-business-day period following the Government's receipt of Taylor's certification that it had completed an Obligation within which the Government has to concur that the work had been completed or notify Taylor of additional information it requires to make a concurrence determination. If the latter, upon receipt of the additional information from Taylor, the Government has a three-business-day period to make the concurrence determination. Within three business days of making the concurrence determination, the Government shall notify the Trustee in writing to disburse the funds to Taylor. A copy of the Disbursement Agreement is attached hereto as Exhibit "2."

28.

Section 4.1 of the Trust Agreement restricts disbursements from the Trust Account to Taylor to the actual costs incurred by Taylor in its performance of an Obligation. In addition,

{N3145512.5}

Section 4.3 of the Trust Agreement imposes a maximum limit on Taylor's disbursements from the Trust Account to the cost estimates shown on Schedule A. Taylor therefore is responsible for paying from funds outside the Trust Account any amounts it spends in excess of the cost estimates for performance of an Obligation.

29.

Sections 4.5 and 4.6 of the Trust Agreement provide for Taylor's submission of a final certification that all Obligations have been completed and for the Government's issuance of a written concurrence that Taylor has properly completed all the Obligations. Upon issuance of the concurrence, all funds remaining in the Trust Account are to be released to Taylor, with the exception of certain hold back funds, as specified in Section 4.7.

30.

Under Section 4.7 of the Trust Agreement, after the completion of the Obligations, Taylor agreed "to a seven (7) year hold back of Trust Funds in an amount of $50,000,000 for potential residual Obligations associated with the Trust Agreement," subject to the release to Taylor of half of the hold back amount, or $25,000,000, after three years and six months under specified circumstances and the release of the remaining balance of $25,000,000 to Taylor after seven years. As specified in Section 4.7, the hold back funds were to "serve as a cash reserve guarantee to fund any operations required due to a failure" of the decommissioning work completed by Taylor. The seven-year hold back period set forth in Section 4.7 parallels the regulatory requirement for keeping an OCS lessee's lease-compliance bond in place for seven years following lease termination. *See* 30 C.F.R. § 556.58.

31.

Section 4.8 of the Trust Agreement requires the Government to provide written notice to Taylor of Taylor's failure to comply with any material provision of the Trust Agreement and further provides Taylor with a ten-business-day period following the Government's written notice to cure the asserted instance of noncompliance.

32.

The Trust Agreement does not contain an express time period to complete the performance of the Obligations.  Rather, with respect to termination, the Trust Agreement provides only that it shall terminate upon the "mutual written agreement" of the Government and Taylor or upon Taylor's "compliance with all Obligations as evidenced by written concurrence" of the Government.  Trust Agreement, § 6.8.

33.

Section 6.9 of the Trust Agreement provides:  "[t]his Trust Agreement shall be governed by and construed in accordance with the laws of the State of Louisiana without giving effect to that state's conflicts of laws rules, but the parties consent to the jurisdiction of the federal courts to resolve any dispute arising under the Trust Agreement."

TAYLOR'S PERFORMANCE

34.

As of the filing of this Complaint, Taylor has performed and successfully completed the following Obligations, for which it has received approval from the Government and reimbursement (or in certain instances partial reimbursement) of funds from the Trust Account:

(1) plugging and abandonment of 9 of the 25 wells by drilling intervention wells;[3]

---

[3] Following completion of the plugging and abandonment of five of the nine wells, for which actual costs incurred by Taylor were less than the allotted $25.5 million per well amount,

(2) removal of the deck and flare boom from platform A;

(3) clearance of the seafloor of obstructions; and

(4) removal of pipelines.

Taylor completed the last of these activities, clearance of the seafloor of obstructions, by July 2011, over four years ago.[4]

35.

In connection with the well decommissioning performed by Taylor, both the Government and Taylor recognized the impossibility of pursuing conventional plugging and abandonment activities due to the sheer volume and consistency of the overlying mud and sediment, the tangled web of wellbores and the environmental risks associated with accessing the wells under these circumstances. A copy of a diagram depicting the MC20 area following the Incident is attached hereto as Exhibit "3."

36.

Therefore, the Government, through MMS, conducted an Environmental Assessment in April 2008 to address environmental considerations associated with the approval of alternate procedures or departures from regulatory decommissioning requirements for plugging the MC20

---

Taylor submitted a supplemental disbursement request under the provisions of Section I.D.1 of the Disbursement Agreement, which allow Taylor to claim an additional disbursement for drilling rig costs it paid under its rig contract for days on which the rig did not actually operate, so long as the total amount reimbursed to Taylor from the Trust Account does not exceed $25.5 million per well. The Government denied the request, and, as a result, a total of approximately $10.4 million remains in the Trust Account that is attributable to this denied request.

[4] Consistent with regulatory procedure, it is typical for an OCS lessee to sequence its decommissioning so that the final activity performed is clearance of the seafloor of obstructions. *See* 30 C.F.R. § 250.1740 (an operator must verify that the site is clear of obstructions within 60 days *after* permanently plugging a well or removing a platform or other facility); 30 C.F.R. § 250.1743 (an operator must certify that a well site is clear of obstructions within 30 days *after* it completes its seafloor verification activities).

wells.   Pursuant to the April 2008 Environmental Assessment, the Government approved a departure that allowed Taylor to plug and abandon wells by drilling intervention wells rather than by conventional methods.  Pursuant to this highly complex procedure, a separate, new well, called an intervention well, is drilled alongside each target well, which is the existing well that is being plugged.   To perform the plugging, the intervention well intercepts the target well downhole, and plugging material is injected from the intervention well through its casing into target well through its casing to set plugs above the perforated intervals.  These plugs inhibit the flow of hydrocarbons up the target well.   Under the procedure, the intervention well must intercept the target well at a precise location for injection of plugging material into the target well.  The intervention wellbore must be oriented directly above the target well to allow for a sustained communication channel for injection of the plugging material into the target well. Specifically, the plug and abandonment procedure by intervention well requires: (a) the drilling of an intervention well, ranging from 7,000 to 10,000 feet in depth, for each target well; (b) interception of the target well at a precise location; (c) a properly oriented 20 foot minimum parallel path between the intervention and target well, with a 4 to 9 inch separation edge-to-edge between the wells; and (d) a sustained communication channel (perforations) into the target well for the plugging material.  This procedure is technically challenging, with a very small margin for error.  The margin for error is so slim that the intervention well procedure offers only a single, unrepeatable opportunity for the highest probability of success.  Although subject to repetition, the chances of successfully plugging the target well decrease dramatically if the first effort fails.

37.

By contrast, conventional plugging and abandonment typically proceeds by re-entering the target well internally from the surface, maintaining well control and inserting cement plugs. With conventional plugging and abandonment, there are unlimited opportunities to repeat the procedure with the same margin for success.

38.

To devise and drill the intervention wells, Taylor assembled a team of world-renowned experts and invented new patented technologies, some of which were later used successfully by BP to address the Macondo well spill event that followed the Deepwater Horizon rig explosion in the Gulf of Mexico on April 20, 2010.

39.

Before Hurricane Ivan, most of the MC20 wells were unable to flow under their own declining reservoir pressure and had been producing only under enhanced recovery techniques involving supplemental lift.[5]  Taylor scheduled its drilling of intervention wells by prioritizing those wells that presented the highest risk of potential natural flow of hydrocarbons into the environment.  Taylor's drilling of intervention wells to plug the first four wells eliminated the two oil plumes that were present at MC20 following Hurricane Ivan.  Taylor then drilled five additional intervention wells to successfully plug five other wells that had the potential to flow

---

[5] When the natural pressure in an oil reservoir is no longer sufficient to bring the oil to the surface, enhanced recovery techniques, by artificial means, are used to assist in lifting the oil to the surface. *See* Howard R. Williams, Charles J. Meyers, Patrick H. Martin and Bruce M. Kramer, Williams & Myers Manual of Oil and Gas Terms 58, 318 (15th ed. 2012) (providing definitions of "artificial lift" and "enhanced recovery").  One enhanced recovery technique is supplemental lift by the injection of gas to add pressure that assists in driving the oil to the surface.

significant rates of hydrocarbons into the environment. Taylor completed work on the intervention well to plug the ninth MC20 well in March 2011, over four years ago.

40.

Taylor's successful performance of the drilling of intervention wells to plug nine of the MC20 wells, its removal of the deck and flare boom from platform A, its clearance of the seafloor of obstructions and its removal of pipelines have substantially reduced the potential environmental risk and potential pollution threat at MC20.[6]

41.

As of the filing of this Complaint, the only Obligations designated in the Trust Agreement that have not been performed are the plugging and abandonment of the remaining sixteen wells and the removal of contaminated soil.

42.

Beginning in 2007 and continuing after completion of the ninth intervention well in 2011, the Government and Taylor have engaged in extensive and comprehensive study, assessment, evaluation and analysis with respect to the risk and feasibility of Taylor's performance of the Obligations set forth in the Trust Agreement.

---

[6] While this Complaint concerns only the Trust Agreement, Taylor's efforts in response to the MC20 Incident have been comprehensive and continue to extend far beyond its performance of the Obligations specified in the Trust Agreement. For more than a decade, Taylor has worked tirelessly in full cooperation with the cognizant agencies to address the MC20 Incident. By way of example, Taylor's comprehensive response efforts have included the development of new technologies associated with drilling the intervention wells, the construction and deployment of three containment domes to assist in the elimination of three hydrocarbon plumes, continuous overflights at MC20 to monitor the surface sheen and the assembly of a group of the world's preeminent experts in their respective fields to conduct studies and analyses and to develop strategies for remediation and containment of any remaining ecological risk posed by the MC20 Incident. To date, Taylor has expended in excess of $480 million in its response efforts (of this amount, Taylor received reimbursement of approximately $234 million from its funds held in the Trust Account while expending approximately $246 million from its funds outside the Trust Account).

43.

After Taylor's completion of the ninth intervention well and in recognition of the technical risks associated with the intervention well procedure and the significant increase in those risks posed by the drilling of further intervention wells in an area that already featured 37 wellbores in close proximity to one another, in early 2012, the Unified Command established a technical committee, known as the well review workgroup, to analyze the technical risks of drilling further intervention wells for the remaining sixteen wells. The committee was comprised of experts from BSEE, Coast Guard and Taylor. This well review workgroup met twice a month from April through October of 2012. It completed a comprehensive assessment of each individual well, including: (1) reservoir parameters and a determination of the well's ability to flow to predict potential future flow from the wellbore and/or remaining open reservoirs; (2) historical production history; (3) the integrity of existing wellbore components and subsurface safety devices to determine their potential to fail; and (4) a detailed review of all drilling-related risks involved with well intervention on each specific well.

44.

Careful study of the risks associated with intervention of the remaining sixteen wells was necessary because, with the drilling of each additional intervention well at MC20, the risk of adverse environmental consequences increases due to factors such as the close proximity of the target wells, the potential for well collisions, the potential for inadequately plugged perforations to be in communication with higher pressured reservoirs, resulting cross-flow potential, breaches of near-surface seals and other threats to well integrity, all of which could result in an induced flow event from a currently static wellbore for which a technical solution would likely not exist to terminate the flow. Put differently, given the current static and non-flowing condition of the

remaining sixteen wells, the risk of inducing flow from one or more of them by the intervention well plugging procedure demanded careful examination and a risk-benefit analysis.

45.

Following the Incident and starting as early as 2004, Taylor also commissioned various geotechnical studies by leading experts.  After initial dredging of a small test area proved futile, Taylor commissioned additional expert geotechnical studies to determine the feasibility of excavation of the contaminated soil at MC20.  Those studies ultimately resulted in the conclusion by the experts retained by Taylor that removal of the contaminated soil was not technically feasible – estimates of the volume of cubic yards of sediment that would need to be removed ranged in the millions or even billions – and would pose greater environmental risk than benefit.

46.

In addition to the expert geotechnical studies commissioned by Taylor, the Government, through the MMS, conducted a Site-Specific Environmental Assessment in 2009 that addressed options for remediation of the contaminated soil at MC20.  *See* Site-Specific Environmental Assessment of the Application for Permit for the Decommissioning of Platform A and Lease Site Remediation at MC20, submitted on September 10, 2009 ("2009 SSEA").  Specifically, the 2009 SSEA addressed both decommissioning the MC20 platform and "Taylor's proposal to allow any contaminated sediments to be left-in-place with natural sedimentation/mudslide events providing a continual cap [over] the affected soil." 2009 SSEA at ii. The 2009 SSEA resulted in a Finding of No Significant Impact (FONSI) applicable both to the platform decommissioning and the proposal to leave the contaminated soil in place. *Id.* In its assessment of the soil options and their potential impacts on water quality, the MMS concluded:  "by leaving the contaminated

MC20 soils in place and allowing natural sedimentation to cover the material, exposure rates will decrease over time and serious concerns related to excavation/transport of the sediments through the water column can be avoided." *Id.* at 10. Pursuant to the 2009 SSEA, the MMS therefore concurred with the independent experts retained by Taylor that removal of the contaminated soil would pose greater environmental risk than benefit and that the more environmentally beneficial choice was to leave the soil in place to allow for natural attenuation.

47.

In further connection with the studies of the soil conditions, in 2012, the Unified Command established a second technical committee, the sheen source workgroup, which, like the well review workgroup, met twice a month from April through October of 2012, and was comprised of experts from BSEE, BOEM, Coast Guard, the National Oceanic and Atmospheric Administration ("NOAA"), Taylor and Taylor-retained experts affiliated with the Woods Hole Oceanographic Institute. The sheen source workgroup reviewed all subsea surveys and geotechnical data on soil conditions for purposes of identifying any remaining hydrocarbon point source from the contaminated soil.

THE CONSENSUS ECOLOGICAL RISK ASSESSMENT WORKSHOP AND REPORT

48.

Following Taylor's completion of the drilling of the ninth intervention well and the well flow and integrity assessments performed by the well review workgroup and the geotechnical data review performed by the sheen source workgroup, the Unified Command convened "a broadly-based group of stakeholders with applicable expertise" to attend a workshop and conduct a Consensus Ecological Risk Assessment ("CERA") during May and June 2013. *See* Ecological Risk Assessment: Consensus Workshop, An Examination of the Potential Ecological Impacts of Response Alternatives Being Considered for Sheen Abatement for the Remnants of the Taylor

{N3145512.5}

Energy Company, LLC MC-20A Platform – Gulf of Mexico ("the CERA Report"), July 2013, at

1. "The CERA process is designed to help environmental managers compare ecological

consequences of specific response options." CERA Report at 2. One of the main purposes of

the CERA workshop was "to evaluate potential ecological impacts of available response options"

associated with the performance of Taylor's remaining Obligations under the Trust Agreement.

The risk assessment analysis specifically centered on an evaluation of the ecological

consequences of soil removal and drilling additional intervention wells. CERA Report at 1-2.

49.

Participants in the CERA workshop included policy officials and experts from BSEE,

BOEM, DOI, the Coast Guard, Taylor, NOAA, the Environmental Protection Agency, the

United States Geological Survey, the United States Fish and Wildlife Service, Louisiana State

University, the Louisiana Department of Environmental Quality and Louisiana's Oil Spill

Coordinator's Office.

50.

The CERA workshop resulted in the issuance of the CERA Report in July 2013. The

CERA Report contained two primary conclusions endorsed and agreed to by all participating

Federal and State agencies: (1) the ecological risks associated with drilling <u>any</u> additional

intervention wells to plug and abandon the remaining sixteen wells outweigh any ecological

benefits, and (2) the ecological risks associated with dredging the seafloor to remove

contaminated soil outweigh any ecological benefits. CERA Report, §§ 6.3.1, 6.3.2 and 6.3.7.

51.

With respect to drilling additional intervention wells, the CERA Report specifically

concluded: "[d]rilling intervention wells for all remaining wells or just potential flow wells does

not provide sufficient ecological benefits when considered in the context of the risk and impacts

{N3145512.5}

associated with the drilling and plugging operations (probability of success, seafloor disturbance, operational discharges, risk of adverse outcome)." CERA Report at § 6.3.2; *see also id.* at § 6.3.7 (recommending not to pursue "additional well intervention because the ecological risks outweigh the possible benefits."). Thus, the CERA Report stated that the risks of drilling intervention wells to plug the remaining sixteen wells – as called for in the Obligations under the Trust Agreement – outweighed the ecological benefits of such action.

52.

With respect to removal of the contaminated soil, the CERA Report specifically concluded: "[d]redging options, disposal or capping are not considered practical due to seafloor sediment characteristics and could have unintended adverse consequences from increased releases and resuspension of sediments and contaminants." It further concluded that "[t]he ecological risk of dredge/dispose and dredge/capping outweigh ecological benefits." CERA Report at § 6.3.1; *see also id.* at § 6.3.6 ("[t]he group concludes that current sedimentation provides a natural mechanism for attenuation."). Thus, the CERA Report stated that the risks of removing the contaminated soil – again, as called for in the Obligations under the Trust Agreement – outweighed the ecological benefits of such action.

53.

The Government has repeatedly confirmed these primary conclusions reached by the participants in the CERA workshop and the CERA Report, which were reached through a process that featured full participation not only by the Federal agencies with expertise and jurisdiction over prevention of pollution from OCS wells but also by State agencies with respective expertise and jurisdiction over prevention of pollution from OCS operations that may affect Louisiana's waters and coast.

THE FINAL RISK ASSESSMENT AND COST ESTIMATE WORKSHOP AND REPORT

54.

Following issuance of the CERA Report, at the Unified Command's request:  (1) BSEE established a Working Group Charter, on January 13, 2014, to develop a risk analysis summary and potential discharge flow rates for the wells at MC20 and further to develop worst case discharge scenarios for all wells at the MC20 site; and (2) the Coast Guard established a Working Group Charter, on November 27, 2013, to develop a cost estimate for incident response activities necessary to address any residual risk posed by possible oil discharge at MC20.

55.

To reach final conclusions on the risk analysis and response cost estimate, the Unified Command held a Final Risk Assessment and Cost Estimate workshop (the "FRACE workshop") on March 25 and 26, 2014.  The goal of the FRACE workshop was to resolve any remaining scientific and factual issues in an effort to reach a final resolution regarding Taylor's responsibilities to address the MC20 Incident primarily by an assessment of the remaining risk posed by the MC20 site and the estimated cost to mitigate that risk.

56.

To promote the achievement of the FRACE objective, Taylor prepared and submitted, at the request of the Unified Command, a comprehensive summary with a chronology and synopsis of all studies and analyses that had been performed with respect to the MC20 site.  This summary contained hyperlinks to all the actual research documents, studies, technical analyses and assessments performed by the Unified Command as a whole, as well as those performed by the Coast Guard, BSEE and Taylor and its independent expert consultants (the "FRACE Report").

57.

In addition to the compilation of all prior studies and analyses that had been conducted with respect to the MC20 site, the FRACE Report included a number of new expert studies that were conducted for purposes of the FRACE workshop, including two performed by Dagmar Schmidt Etkin, PhD, of Environmental Research Consulting, an expert frequently used by the Coast Guard and retained by Taylor at the Coast Guard's direction. Specifically, Dr. Etkin performed an assessment of the potential costs and impacts associated with hypothetical future releases from the MC20 wells and an assessment of discharge scenario probabilities with respect to the MC20 wells, analyzing flow rate, flow duration and total release. One of Dr. Etkin's key conclusions with respect to her assessment of discharge scenario probabilities was that the overall annual probability of a spillage or leak event from one or more of the MC20 wells is very low; an incident would be expected once in 1,742 years.

58.

The two-day FRACE workshop concluded with a request from the Government for additional time for consideration and evaluation of the risk assessment and cost estimate analyses and conclusions. Importantly, the Government did not request – and has not subsequently requested – that Taylor perform any of the remaining Obligations under the Trust Agreement, much less that Taylor perform those Obligations within a set timetable. Likewise, Taylor has never received written notice of its noncompliance from the Government under Section 4.8 of the Trust Agreement, nor has Taylor, since its entry into the Trust Agreement, received any notice of noncompliance from BSEE pursuant to its regulatory authority.

## THE GOVERNMENT'S ACTIONS IN BREACH OF THE TRUST AGREEMENT

59.

On May 14, 2015, four Government agencies, BSEE, the Department of Justice, the Coast Guard and BOEM, jointly issued a document entitled "The United States' Views on the Status of Taylor Energy Company's Obligations at Well Site MC-20 and Taylor Energy's Ongoing Oil Spill" (the "US Views document"). In the US Views document, while stating that "[t]he work that Taylor Energy committed to do in the 2008 Trust Agreement has not been completed," the Government continued to question whether "proper well plugging and abandonment is . . . currently technologically feasible." Notwithstanding its acknowledgment of doubt as to the current technical capability to perform the remaining plugging and abandonment Obligations, the Government stated its intention to withhold all funds held in the Trust Account "in face of . . . the presence of unplugged and/or unsecured wells." The Government then reconfirmed that it would not authorize the release of any funds from the Trust Account until "decommissioning work . . . is completed." Additionally, the Government stated that the possibility that "improved technology" may come into existence at some indefinite point "in the near or more distant future" foreclosed any reliance by Taylor on the unavailability of "existing" technology to address the issues at MC20.

60.

Separately, on March 21, 2014, in connection with the FRACE workshop, Taylor had requested in writing that the Government approve a "Request for Departure or Alternative Procedure" to grant departures from further intervention well decommissioning for the remaining sixteen wells at MC20 and to grant a departure or alternative procedure authorizing Taylor to allow any contaminated soil at MC20 to be left in place with natural sedimentation to provide a continual cap over the affected soils (the "Request"). Taylor made the Request in conformity

{N3145512.5}

with the primary "consensus" conclusions reached in the CERA Report, as further supported by additional studies and analyses in the FRACE Report, that concluded that the drilling of any additional intervention wells or attempts to remove the contaminated soil would pose greater ecological risk than benefit.

61.

Over one year later, on May 11, 2015, the Government denied Taylor's Request (the "Denial"). In the Denial, the Government stated that:  (a) it "agrees that there may be risks associated with further intervention" but that "there is no way to know whether, in the future, hydrocarbons could flow from the 16 unplugged wells . . . .;" and (b) it denied Taylor's request to leave the contaminated soil in place because there may be "the possible future need to remove the contaminated soil in order to reach the still-vertical portions of the wellbores to perform more conventional decommissioning" and because the Government may "require Taylor to remove it at some point in the future should such removal become necessary."  In concluding its Denial, the Government stated that it denied Taylor's Request because of "the possibility" that it "may" require "future plugging and abandonment work and/or the removal of the contaminated sediments."  Accordingly, by its Denial, the Government confirmed that any performance by Taylor of the remaining Obligations under the Trust Agreement to drill additional intervention wells to plug the remaining sixteen wells and to remove the contaminated soil would only occur, if at all, at some uncertain future date.  Put another way, the Government did not require Taylor to perform, and gave no indication if or when it would require Taylor to perform in the foreseeable future, any of the remaining Obligations, in contravention of the Trust Agreement under the applicable law.

62.

At approximately the same time as its issuance of the US Views document and the Denial, the Government posted three documents on BSEE's website that publicly disclosed the Government's position on the status of Taylor's MC20 response (the "BSEE web postings"). In the BSEE web postings, the Government publicly disclosed that it had placed Taylor's performance of its remaining Trust Agreement Obligations on an indefinite hold, stating that "[f]uture work to be performed under the Trust Agreement will be determined based on site conditions and the availability of applicable technology" and that "[s]ignificant uncertainty exists about future events, including discharge sources, cross-flows, pressure recharge in the oil reservoirs, evolving technology, and suitable remediation measures." Despite its recognition of the "uncertainty" about future events and the need for further evolution of technology beyond the decommissioning techniques currently available, the Government stated that the "funds provided by Taylor Energy in accordance with the Trust Agreement in 2008 must remain in the Trust to provide for further decommissioning activities."

63.

In sum, despite Taylor's completion of the last decommissioning Obligation under the almost-eight-year-old Trust Agreement over four years ago, the Government has, by contemporaneous and consistent statements in the US Views document and the BSEE web postings, as confirmed by its statements in the Denial, unambiguously taken the public position that it will retain Taylor's funds in the Trust Account for an indefinite time pending Taylor's completion of the remaining Obligations. At the same time, the Government has given no orders or instructions to Taylor to perform any of those Obligations and, in fact, has instructed Taylor

that it should not perform those Obligations unless and until Taylor receives such an instruction from the Government at some uncertain future date, if ever.

64.

These actions by the Government constitute a breach of the Trust Agreement under governing Louisiana law. The remedy Taylor seeks for the Government's breach of the Trust Agreement is the release to Taylor of its funds that currently remain in the Trust Account, plus the damages suffered by Taylor as a result of the Government's breach. As of the filing of this Complaint, approximately $432,000,000 of Taylor's funds remain frozen in the Trust Account for the performance of Obligations that the Government has confirmed cannot currently be performed and may not ever be performed.

65.

Since the Incident occurred, Taylor has continuously cooperated with the Government agencies and has complied with all its legal obligations on multiple fronts at substantial expense. By this Complaint, Taylor does not seek, nor could it seek, to avoid its legal obligations to respond to the Incident, and a decision by this Court recognizing the Government's contractual breach and granting Taylor the relief it requests by requiring the release of Taylor's funds held in the Trust Account to Taylor would not serve to relieve Taylor of those legal responsibilities. Indeed, a decision by this Court to release Taylor's funds held in the Trust Account would free those funds for Taylor's use to continue its demonstrated practice of full compliance with its legal responsibilities.

{N3145512.5}

## COUNT ONE

### The Government Has Breached the Trust Agreement by Its Unilateral Insertion of an Indefinite Term for Taylor's Performance

66.

Taylor re-alleges and incorporates by reference Paragraphs 1 – 65 above.

67.

The Trust Agreement does not contain an express, fixed or determinable time period for Taylor to complete the performance of the Obligations.

68.

Governing Louisiana law provides that, when, as here, a contract is silent on an express, fixed or determinable term for performance, the contract must be performed within a "reasonable time." La. Civ. Code art. 1778 (when the term for performance of a contract is not fixed and is not determinable, the contract "must be performed within a reasonable time.").

69.

The nature of the contract, the circumstances surrounding it and pertinent usage and custom define a "reasonable time" for performance of a contract when the contract is silent as to its term. *See* La. Civ. Code art. 2053.

70.

Here, the nature of the Trust Agreement and the circumstances surrounding it center upon Taylor's performance of certain decommissioning Obligations at MC20, including its Obligations to plug and abandon wells, remove the deck and flare boom from the platform, clear the seafloor of obstructions, remove pipelines and remove contaminated soil.

71.

With respect to the time limits for performance of decommissioning obligations, the Government's regulations under OCSLA require an operator: (a) to "permanently plug all wells on a lease within 1 year after the lease terminates," 30 C.F.R. §250.1710; (b) to "remove all platforms and other facilities within 1 year after the lease or pipeline right-of-way terminates," 30 C.F.R. §250.1725; and (c) to "verify that the site is clear of obstructions" within 60 days of permanent plugging of a well or removal of a platform, 30 C.F.R. §250.1740.

72.

Before the parties entered into the Trust Agreement on March 19, 2008, the Government, in October 2007, had ordered Taylor to permanently plug and abandon all wells at MC20 by June 2008, within one year of termination of the leases.

73.

With respect to requirements related to the type of technology an operator must use, the Government's regulations under OCSLA require an operator to "use best available and safest technology (BAST) whenever practical on all exploration, development, and production operations." 30 C.F.R. § 250.107 (emphasis added); *see also* 43 U.S.C. § 1347(b); 30 C.F.R. § 250.105.

74.

The nature of the Trust Agreement, the circumstances surrounding it and pertinent usage and custom establish that a reasonable time for its performance cannot be indefinite and potentially in perpetuity.

75.

Given that the parties entered into the Trust Agreement almost eight years ago and that Taylor completed its last Obligation under the Trust Agreement over four years ago, a reasonable time for completion of Taylor's performance cannot be some uncertain future date, particularly when the Government's regulatory practice requires completion of decommissioning obligations within one year of lease termination and when, under the circumstances of the MC20 site, it had previously ordered Taylor to permanently plug and abandon all wells within one year of lease termination.

76.

The nature of the Trust Agreement, the circumstances surrounding it and pertinent usage and custom establish that its term for Taylor's performance of the Obligations cannot be dependent on hypothetical future changes in site conditions nor on the speculative development of technology that does not currently exist. Instead, the Government's regulations specify that decommissioning obligations must be performed within one year of lease termination irrespective of potential changes in site conditions and that an operator must use best "available" technology in the performance of its lease operations, not potential new technology that hypothetically may be invented at some indefinite point in the future.

77.

The language of Section 4.7 of the Trust Agreement further demonstrates that a reasonable time for performance cannot be indefinite or in perpetuity by setting forth express time limits of 3½ and 7 years for the release of the hold back funds "in an amount of $50,000,000 for potential residual Obligations associated with this Trust Agreement." Trust Agreement, § 4.7. In fact, the 7-year hold back period in Section 4.7 mirrors the Government's

regulatory requirement that an OCS lessee must keep a bond to guarantee its compliance with the lease in place for a period of seven years following lease termination.

78.

Accordingly, the Government's position, as set forth in the US Views document and the BSEE web postings, that Taylor's funds held in the Trust Account must remain in trust indefinitely, and possibly in perpetuity, violates governing Louisiana law that requires performance of the contract within a reasonable time.

79.

Because Louisiana law imposes a requirement that performance of every contract must be complete within some ascertainable term, La. Civ. Code art. 1778, the Government has breached the Trust Agreement by its actions to suspend Taylor's performance of its remaining Obligations indefinitely and potentially in perpetuity.

80.

The Government has breached the Trust Agreement by unilaterally inserting into the contract an indefinite and potentially perpetual term for Taylor's performance of the remaining Obligations. This breach entitles Taylor to monetary damages, including the release of its funds held in the Trust Account for the performance of the remaining Obligations, and the monetary damages Taylor has suffered as a consequence of the Government's breach. The Trust Agreement designates $408,000,000 of the $432,000,000 amount remaining in the Trust Account for use to permanently plug and abandon the remaining sixteen wells and designates $13,000,000 of the amount remaining in the Trust Account for use for the removal of contaminated soil.[7]

---

[7] As previously referenced, an additional amount of approximately $10.4 million also remains in the Trust Account due to the Government's denial of Taylor's supplemental disbursement request related to the plugging and abandonment of five of the nine wells. *See supra* note 3.

## COUNT TWO

**Request for Dissolution**
**Based on Impossibility of Performance**

81.

Taylor re-alleges and incorporates by reference Paragraphs 1 – 80 above.

82.

To obtain reimbursement of its funds held in the Trust Account, Taylor's remaining Obligations under the Trust Agreement require Taylor to complete its regulatory decommissioning obligations by plugging and abandoning the remaining sixteen wells and removing contaminated soil from the seafloor at the MC20 site.

83.

The governing federal statutes and regulations prohibit the performance of decommissioning activities when their performance may cause "undue or serious harm or damage to the human, marine, or coastal environment." 30 C.F.R. § 250.1703(f); *see also* 43 U.S.C. § 1332(6).

84.

Under Louisiana law, a contracting party is not liable for its failure to perform contract obligations when its failure is caused by a fortuitous event that makes performance impossible. La. Civ. Code art. 1873.

85.

Louisiana law defines a fortuitous event as "one that, at the time the contract was made, could not have been reasonably foreseen." La. Civ. Code art. 1875.

86.

When Taylor and the Government entered into the Trust Agreement in 2008, they could not have reasonably foreseen that Taylor's performance of decommissioning activities at MC20 to plug and abandon the remaining sixteen wells and remove contaminated soil from the seafloor would risk causing undue or serious harm to the human, marine and/or coastal environment.

87.

Since Taylor and the Government entered into the Trust Agreement in 2008, a group of world renowned scientific experts, including both Federal and State agency experts and independent private-sector experts retained by Taylor, have concluded through extensive study, evaluation and analysis that Taylor's performance of the plugging and abandonment of the remaining sixteen wells and its removal of the contaminated soil at the site would risk causing undue or serious harm to the human, marine and/or coastal environment. *See, e.g.,* CERA Report at §§ 6.3.2, 6.3.7, 6.3.1 and 6.3.6.

88.

The experts' conclusion, which Taylor and Government could not have reasonably foreseen at the time they entered into the Trust Agreement, renders it impossible for Taylor to perform the Trust Agreement Obligations to plug and abandon the remaining sixteen wells and remove the contaminated soil because statutory and regulatory law prohibit Taylor from performing them.

89.

Because it is impossible for Taylor to perform its remaining Obligations under the Trust Agreement to plug and abandon the remaining sixteen wells and remove the contaminated soil,

under Louisiana law, the Trust Agreement "is dissolved," La. Civ. Code art. 1876, thereby entitling Taylor to the release of its funds held in the Trust Account.

## COUNT THREE

### Request for Reformation or Partial Rescission
### Based on Mutual Error

90.

Taylor re-alleges and incorporates by reference Paragraphs 1 – 89 above.

91.

To obtain reimbursement of its funds held in the Trust Account, Taylor's remaining Obligations under the Trust Agreement require Taylor to plug and abandon the remaining sixteen wells and remove contaminated soil from the seafloor at the MC20 site.

92.

When Taylor and the Government entered into the Trust Agreement in 2008, they both mistakenly contemplated that Taylor's performance of the Obligation to plug and abandon each of the 25 MC20 wells would pose greater benefit than risk to the environment. This has proven not to be the case.

93.

When Taylor and the Government entered into the Trust Agreement in 2008, they both mistakenly contemplated that Taylor's performance of the Obligation to remove the contaminated soil was technically possible and would pose greater benefit than risk to the environment. This has proven not to be the case.

94.

Under Louisiana law, mutual error as to the contracting parties' cause for the contract vitiates the parties' consent, entitling the party asserting the error to reformation or partial

rescission of the contract. La. Civ. Code arts. 1948-1950; *see also* La. Civ. Code art. 1967 (defining "cause" as "the reason why a party obligates himself.") and La. Civ. Code art. 2034.

95.

The Government and Taylor mutually erred as to their contractual cause when they agreed that it was more environmentally beneficial than risky for Taylor to perform the Obligation to plug and abandon the remaining sixteen unplugged wells at MC20.

96.

The Government and Taylor mutually erred as to their contractual cause when they agreed that it was technically possible and more environmentally beneficial than risky for Taylor to perform the Obligation to remove the contaminated soil from the seafloor at MC20.

97.

Despite the Government's acknowledgement that Taylor's performance of its remaining Obligations is not technically feasible at this time and that Taylor's performance would pose greater environmental risk than benefit, the Government has formally communicated its decision to Taylor that it intends to hold Taylor's funds in the Trust Account indefinitely, and possibly in perpetuity, all with a lack of any technical direction from the Government as to how Taylor could accomplish the performance of the remaining Obligations.

98.

The mutual error of the Government and Taylor as to Taylor's technical ability to perform its remaining Obligations and Taylor's ability to do so in a manner that poses greater benefit than risk to the environment vitiates their consent to have Taylor perform those Obligations.

99.

Because the Government and Taylor mutually erred when they agreed in the Trust Agreement that Taylor's performance of the plugging and abandonment of the remaining sixteen wells was more environmentally beneficial than risky and that Taylor's performance of the removal of contaminated soil from the seafloor was technically possible and more environmentally beneficial than risky, Taylor seeks reformation or partial rescission of the Trust Agreement as to those Obligations and a release of its funds held in the Trust Account designated for their performance.

## COUNT FOUR

### The Government Has Breached Its Obligation
### of Good Faith and Fair Dealing

100.

Taylor re-alleges and incorporates by reference Paragraphs 1 – 99 above.

101.

Louisiana law imposes an implied duty upon contracting parties to perform their contracts in good faith. La. Civ. Code art. 1759 ("Good faith shall govern the conduct of the obligor and the obligee in whatever pertains to the obligations."); La. Civ. Code art. 1983 ("Contracts must be performed in good faith.").

102.

The Government breached its obligation of good faith and fair dealing by its unilateral imposition of an indefinite term for Taylor's performance of the remaining Obligations under the Trust Agreement and its decision, almost eight years into the contract, that Taylor's funds must be maintained in the Trust Account indefinitely until the Government determines, at some

uncertain future date, if ever, whether it will authorize Taylor's performance of the remaining

Obligations under the Trust Agreement.

103.

The Government breached its obligation of good faith and fair dealing by its actions and

acknowledgment that it will not authorize Taylor to perform decommissioning activities on the

remaining sixteen wells at this time or to remove the contaminated soil at this time and that any

additional decommissioning activities are presently unknown and will only be determined, if at

all, at some uncertain future date.

104.

The Government breached its obligation of good faith and fair dealing by its refusal to

direct release to Taylor of the funds remaining in the Trust Account and its formal

communication to Taylor of its decision that those funds must be held indefinitely for their

possible use at some hypothetical point in the future to conduct work that the Government will

not currently authorize and has determined should not be performed under current circumstances

and with currently available technology, given that the environmental risks of performance

outweigh the environmental benefits and given the exceedingly low overall annual probability –

only once in 1,742 years – of a spillage event from one or more of the MC20 wells.

105.

The Government breached its obligation of good faith and fair dealing by treating Taylor

differently from its customary practice and regulatory standards that apply time limits for the

performance of decommissioning obligations.

106.

The Government breached its obligation of good faith and fair dealing by requiring Taylor to perform decommissioning operations by use of speculative new technology that does not currently exist and therefore by treating Taylor differently from the Government's statutory and regulatory standards that require an operator to use best available and safest technology in the performance of its operations.

107.

The Government breached its obligation of good faith and fair dealing by suspending indefinitely and potentially in perpetuity the seven-year hold-back period set forth in Section 4.7 of the Trust Agreement.

108.

The Government breached its obligation of good faith and fair dealing by refusing to direct the release of Taylor's funds held in the Trust Account notwithstanding that performance of the remaining Obligations under the Trust Agreement is legally impossible and contrary to federal law and regulations.

109.

As a direct and proximate result of the Government's breach of its implied obligation of good faith and fair dealing in its performance of the Trust Agreement, Taylor has incurred substantial monetary damages, including, without limitation, denial of the return of the funds held in the Trust Account, loss of interest income on the funds held in the Trust Account and the incurrence of significant fees to maintain the funds in the Trust Account, all in an amount to be determined at trial.

**RELIEF REQUESTED**

**Wherefore**, Taylor respectfully requests that the Court enter judgment in its favor and against the Government as follows:

(a)      Holding that the Government has breached the Trust Agreement;

(b)      For monetary damages in an amount to be determined at trial;

(c)      For dissolution, reformation or partial rescission of the Trust Agreement with respect to Taylor's performance of its Obligations to plug and abandon the remaining sixteen wells and its Obligation to remove contaminated soil from the seafloor;

(d)      Directing the Government, upon remand, to take all necessary and appropriate actions to instruct the Trustee to release the funds held in the Trust Account to Taylor;

(e)      Pre-judgment and post-judgment interest as permitted by law; and

(f)      Any other relief that the Court may deem appropriate.

Respectfully submitted this _4th_ day of _January_ 2016.

CARL D. ROSENBLUM, T.A. (LA bar no. 2083)
ALIDA C. HAINKEL (LA bar no. 24114)
LAUREN C. MASTIO (LA bar no. 33077)
Jones Walker LLP
201 St. Charles Avenue, 49th Floor
New Orleans, Louisiana 70170-5100
Telephone:  (504) 582-8000
Facsimile:  (504) 589-8296
crosenblum@joneswalker.com

And

JOHN F. COONEY
PAUL A. DEBOLT
Venable LLP
575 7th Street, N.W.
Washington, D.C. 20004
Telephone:  (202) 344-4000

**Attorneys for Plaintiff,
Taylor Energy Company LLC**

{N3145512.5}

## TRUST AGREEMENT

The Trust Agreement (as amended, supplemented, or restated from time to time, this "Trust Agreement") is dated March 19th, 2008, by and among JPMorgan Chase Bank, N.A., a federally insured banking institution, together with its successors and substitutes in trust pursuant to the terms hereof (the "Trustee"), Taylor Energy Company LLC, a Louisiana limited liability company, whose federal tax identification number is 20-3946432, (the "Settlor"), and the United States of America, acting by and through the Minerals Management Service of the United States Department of the Interior (the "Beneficiary").

WHEREAS, to fulfill certain obligations to plug and abandon wells, remove a portion of the platform and facilities, clear the seafloor of obstructions, and take corrective action associated with wells and facilities on Lease OCS-G 04935 (Mississippi Canyon Block 20); Wells A-19, A-20, A-21, A-25, and A-26 on Lease OCS-G 15459 (Mississippi Canyon Block 21); and Well A-28 on Lease OCS-G 15371 (South Pass Block 73), the Settlor and the Beneficiary have entered into this Trust Agreement; and

WHEREAS, the Settlor has established account number P10978008 maintained with the Trustee (the "Trust Account").

NOW, THEREFORE, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows.

### INDEX

| Article | Subject |
|---|---|
| I | Defined Terms |
| II | Declaration of Trust |
| III | Resignation and Removal of Trustee; Appointment of Successors |
| IV | Disbursements |
| V | Cost Estimates, Reviews, and Work Phases |
| VI | Miscellaneous |
| Schedule A | Work Cost Estimates |
| Schedule B | Schedule of Fees |

**EXHIBIT 1**

# ARTICLE I
## DEFINED TERMS

1.1    <u>Terms Defined Above.</u>  As used in this Trust Agreement, the terms "<u>Beneficiary</u>", "<u>Settlor</u>", "<u>Trust Account</u>", and "<u>Trustee</u>" shall have the meanings assigned to such terms above.

1.2    <u>Defined Terms.</u> As used in this Trust Agreement, the following terms shall have the following meanings, unless the context otherwise requires:

(a)    "<u>Authorized Officer</u>" shall mean (i) for the Settlor, an official in a partnership, company, or corporation duly appointed and empowered in writing to bind the partnership, company, or corporation to the U.S. Government, whose appointment must be approved by and on file with the Beneficiary; and (ii) for the Beneficiary, an official empowered to bind the United States of America, acting by and through the Minerals Management Service of the United States Department of the Interior.  The names, telephone numbers, and specimen signatures for each Authorized Officer are designated on Schedule B hereto.  Any addition or deletion of an Authorized Officer shall be effective only upon written notice signed by an Authorized Officer of the Settlor and an Authorized Officer of the Beneficiary, received by the Trustee in accordance with Section 6.1.

(b)    "<u>Cash Equivalents</u>" shall mean:

(i)    Demand deposits at the Trustee;

(ii)    Certificates of deposit issued by the Trustee with maturities of no more than one year from the date of acquisition issued by the Trustee; or

(iii)    Triple-A rated money-market funds (as rated by Standard & Poor's or Moody's Investors Service) offered through the Trustee, secured by debt securities issued or directly and fully guaranteed or insured by the United States Government or any agency or instrumentality thereof.

(c)    "<u>Leases</u>" shall mean (i) Lease OCS-G 04935 (Mississippi Canyon Block 20); (ii) the part of Lease OCS-G 15459 (Mississippi Canyon Block 21) on which Wells A-19, A-20, A-21, A-25, and A-26 are located; and (iii) the part of Lease OCS-G 15371 (South Pass Block 73) on which Well A-28 is located.

(d)   "Obligations" shall mean the duties and costs of the Settlor pertaining thereto to abandon wells, remove the platform and other facilities, clear the seafloor of obstructions, and take corrective action associated with wells as set forth in Schedule A attached hereto arising pursuant to the terms of the Leases and applicable federal regulations related to such Leases.

(e)   "Plan" shall mean the schedule of activities to complete the Obligations, a draft of which Plan shall be provided by the Settlor to the Beneficiary for approval in accordance with Section 5.3.

(f)   "Trust Funds" shall mean all funds deposited into the Trust Account by the Settlor, plus interest earned on such funds, and other Cash Equivalents in the Trust Account, and all certificates, instruments, and documents representing, evidencing, or issued in connection therewith, and all proceeds thereof.

(g)   "Work" shall mean operations to satisfy the Obligations and shall include the costs of any equipment, supplies and fees incurred to perform the Work.

## 1.3   Other Definitional Provisions.

(a)   The words "hereby", "herein", "hereinafter", "hereinabove", "hereinbelow", "hereof", "hereto" and "hereunder" when used in this Trust Agreement shall refer to this Trust Agreement as a whole and not to any particular article, section or provision of this Trust Agreement.

(b)   Article, section, and exhibit references are to such articles, sections of, and exhibits to this Trust Agreement unless otherwise specified.

## ARTICLE II
## DECLARATION OF TRUST

2.1   <u>Appointment of Trustee.</u>  The Settlor and the Beneficiary hereby appoint JPMorgan Chase Bank, N.A. as the Trustee under this Trust Agreement, and JPMorgan Chase Bank, N.A. hereby accepts such appointment.

2.2   <u>Funding of Trust Agreement.</u>  The Trust Account will be initially funded by the deposit of $400,000,000 and will be supplemented by additional funds as provided in the Agreement to Provide Additional Bond.  Any additional funds contributed to the Trust Account shall be in cash or Cash Equivalents.

2.3   <u>Transfer of Funds.</u>  The Settlor intends that any and all funds so transferred into the Trust Account are to be held by the Trustee in trust pursuant to the terms of this Trust Agreement.

2.4   <u>Declaration of Trust.</u>  The Trustee declares that it will hold all funds deposited into the Trust Account on behalf of the Settlor in trust to:

(a)   be disbursed in satisfaction of Obligations pursuant to the terms hereof; and

(b)   for the use and benefit of the Beneficiary to whom the performance of the Obligations is owed by the Settlor, all in accordance with and pursuant to the terms of this Trust Agreement.

2.5   <u>Control and Administration of Trust Funds.</u>

(a)   Except upon termination of this Trust Agreement pursuant to Section 6.8, the Settlor shall have no right to, and the Trustee shall not permit the Settlor without the express written permission of Beneficiary to:

(i)   Withdraw or transfer any of the Trust Funds, except as provided by Sections 4.4 and 6.8;

(ii)   Deliver or transfer any Trust Funds to any person or entity;

(iii)   Otherwise direct the Trustee with respect to the Trust Funds, except as provided in subsection 2.5(c); or

(iv)   Use the funds as collateral to secure any obligation or indebtedness.

(b)   The Beneficiary shall not withdraw or transfer from the Trust Account any of the Trust Funds other than as provided for herein.

4

(c)    The Settlor shall have the sole responsibility and right to direct the Trustee regarding the allocation of all Trust Funds in interest-bearing Cash Equivalents.

2.6    **Periodic Account Statements; Further Information.**  The Trustee shall provide to the Settlor and the Beneficiary monthly financial statements detailing all transactions affecting the Trust Funds and, within five (5) business days following the written request of the Settlor or the Beneficiary, any information regarding the Trust Funds that the Settlor or the Beneficiary may reasonably request.

2.7    **Representations and Warranties.**

(a)    The Trustee represents and warrants to the Settlor and the Beneficiary that:

    (i)    The Trust Funds are not subject to any lien or security interest securing payment of any indebtedness or obligation of the Settlor, or any other person or entity other than pursuant to the terms hereof as security for the Obligations; and

    (ii)    The Trustee has not received any prior notice of any other assignment of, security interest in, pledge of, or claim against any of the Trust Funds.

(b)    The Settlor represents and warrants to the Trustee and the Beneficiary that the Settlor has not received any prior notice of any other assignment of, security interest in, pledge of, or claim against any of the Trust Funds.

2.8    **Waiver of Right to Set-Off.**  The Trustee hereby waives all claims and rights of set-off, recoupment, and banker's and other possessory liens against the Trust Funds. The Trustee agrees not to set-off or reduce the amounts to be paid on the Trust Funds by reason of any liability or obligation that the Settlor or any other person or entity may have to the Trustee, and acknowledges and agrees that its obligation to transfer all amounts owing with respect to the Trust Funds shall be governed solely by the terms and conditions of this Trust Agreement.

2.9    **Fees of Trustee.**  All usual and customary fees, expenses and other charges as set forth on Schedule C attached hereto shall be the responsibility of the Settlor. The Trustee shall have no right to any payment from the Trust Funds for such purposes and shall not be entitled to any compensation from the Beneficiary with respect to this Trust Agreement or any services performed by the Trustee hereunder.

2.10    **Books, Records and Tax Returns.**  The Trustee shall maintain appropriate books and records relating to the receipt and disbursement of all monies received by the Trustee under this Trust Agreement. The Settlor agrees to sign and/or

file all returns with respect to taxes attributable to the Trust Funds. The Trustee shall have no liability for any tax due and payable in connection with this Trust Agreement except for taxes based upon or measured by amounts paid to the Trustee as fees or compensation in connection with the transactions contemplated hereby. All taxes due on interest earned with respect to the Trust Funds are the responsibility of the Settlor, and are not payable liabilities from the Trust Funds. In the event that the Trustee shall ever be required, pursuant to applicable law, to prepare and file state and/or federal tax returns and pay state and/or federal taxes out of the Trust Funds, the Trustee is authorized to do so, after giving notice to the Settlor and the Beneficiary, and, within ten (10) business days after receipt of such notice, the Settlor shall contribute to the Trust Account (subject to the provisions of Section 2.2) funds in an amount equal to the tax payment to be made by the Trustee.

2.11    **Scope of Undertaking.**   The duties and responsibilities of the Trustee in connection with this Trust Agreement will be purely ministerial and will be limited to the duties and responsibilities expressly set forth in this Trust Agreement. The Trustee is not a principal, participant, or beneficiary in any transaction underlying this Trust Agreement and will have no duty to inquire beyond the terms and provisions hereof. The Trustee will not be required to exercise any discretion hereunder and will have no responsibility with respect to investment or management of Trust Funds other than to act in accordance with the written instructions provided herein that all funds shall be maintained in interest bearing Cash Equivalents. The Trustee will never be required to use, advance, or risk its own funds or otherwise incur financial liability in the performance of any of its duties or the exercise of any of its rights and powers hereunder.

The Trustee may rely on, and will not be liable for acting or refraining from acting upon, any written notice, instruction, request, or other communication furnished to it pursuant to this Trust Agreement and believed by it to have been signed and presented by an Authorized Officer.

If any Leases or Trust Funds subject hereto are at any time attached, garnished, or levied upon under any court order, or in case the payment, assignment, transfer, conveyance or delivery of any such property shall be stayed or enjoined by court order, or in case order, judgment or decree shall be made or entered by a court affecting such property or any part hereof, then and in any of such events the Trustee shall rely upon and comply with the advice of counsel of its own choosing as to any such order, writ, judgment or decree.

The Trustee shall notify both the Beneficiary and the Settlor in writing within three (3) business days in the event it is served or becomes aware of any such order, writ, judgment, or decree.

Settlor hereby agrees to protect, defend, indemnify and hold harmless the Trustee against and from any and all costs, losses, liabilities, expenses (including counsel fees and expenses) and claims imposed upon or asserted against the Trustee on account of

6

any action taken or omitted to be taken in connection with its acceptance of or performance of its duties and obligations under this Trust Agreement, except as a result of its gross negligence or willful malfeasance, as well as the reasonable costs and expenses of defending itself against any claim or liability arising out of or relating to this Trust Agreement. This indemnification shall survive the release, discharge, termination and/or satisfaction of the Trust Agreement for a period of ten (10) years. If Settlor is required to make payment to the Trustee with respect to any claims asserted under this Section 2.11, such payment shall not be deducted from the Trust Funds, but shall be paid by the Settlor.

7

# ARTICLE III
## RESIGNATION AND REMOVAL OF TRUSTEE;
## APPOINTMENT OF SUCCESSORS

3.1 **Resignation; Removal; Successor Trustee.** The Trustee or any successor thereto may, with respect to the Trust Account created hereby, resign at any time without cause by giving at least thirty (30) days prior written notice to the Settlor and the Beneficiary, such resignation to be effective on the date of appointment of a successor Trustee as hereinafter provided. In the case of the resignation of the Trustee, the Settlor and the Beneficiary will appoint a successor Trustee by written instrument signed by the Settlor and the Beneficiary.

In the event the Settlor and the Beneficiary shall not have appointed a successor Trustee within thirty (30) days after such notice of resignation by the Trustee, the Trustee agrees to continue as Trustee and may, at the sole expense of the Settlor, apply to a federal court in Louisiana, having jurisdiction (the "Court"), to appoint a successor Trustee to act effective as of the date specified by the court until such time, if any, as a successor is appointed by the Settlor and the Beneficiary as provided for above.

Any successor Trustee so appointed by such Court shall immediately and without further act be superseded by any successor Trustee thereafter appointed by the Settlor and the Beneficiary as provided for above.

In addition, the Settlor and the Beneficiary may at any time remove the Trustee with or without cause by written notice to the Trustee signed by the Settlor and the Beneficiary designating the effective date of any such removal and the party to serve as successor Trustee. A successor Trustee hereunder shall be deemed the Trustee for all purposes hereof, and each reference herein to the Trustee will thereafter be deemed to refer to such successor. Any fees or charges by either the successor or predecessor Trustee are the sole responsibility of the Settlor, and not payable from the Trust Funds.

3.2 **Acceptance of Appointment.** Any successor Trustee, whether appointed by the Court or by the Settlor and the Beneficiary, shall execute and deliver to its predecessor Trustee an instrument, reasonably satisfactory to such predecessor Trustee, accepting such appointment, and thereupon such successor Trustee, without further act, will become vested with all the estates, properties, rights, powers, duties, and trusts of the predecessor Trustee in the Trust Account hereunder with like effect as if originally named as Trustee herein.

Upon the written request of such successor Trustee, such predecessor Trustee shall execute and deliver an instrument, reasonably satisfactory to such successor Trustee, transferring to such successor Trustee all the estates, properties, rights, powers, and trusts of such predecessor Trustee, and such predecessor Trustee shall duly assign,

8

transfer, deliver, and pay over to such successor Trustee the Trust Funds then held by such predecessor Trustee which are subject to this Trust Agreement.

3.3   **Qualifications of Successor Trustee.**   Any successor to the Trustee, however appointed, must be a bank or trust company organized under the laws of the United States or any jurisdictions thereof having a combined capital and surplus of at least $1,000,000,000 and able to perform the duties of the Trustee hereunder upon commercially reasonably or customary terms.

3.4   **Merger of Trustee.**   Any corporation into which the Trustee may be merged or converted or with which it may be consolidated or any corporation resulting from or surviving any merger, conversion, or consolidation to which the Trustee will be a party, or any corporation to which substantially all the corporate trust business of the Trustee may be transferred, will, subject to the terms of this Section, be the Trustee under this Trust Agreement without any further act.

3.5   **Status of Successor Trustee.**   A successor Trustee shall have the same duties, powers, and discretion as conferred herein on its predecessor Trustee.  A successor Trustee may accept the assets of the Trust Account delivered to it by its predecessor Trustee as constituting the entire assets of the Trust Account created hereby and will not be required to take any action to determine what constitutes all assets of such Trust Account or to obtain possession of any other assets or to investigate any acts, omissions, or misconduct of its predecessor Trustee.

9

## ARTICLE IV
## DISBURSEMENTS

4.1    **Disbursements for Obligations performed.** Upon receipt of notice from the Beneficiary, disbursements may be made by the Trustee from the Trust Account to the Settlor based upon a corresponding reduction of the Obligations in accordance with Schedule A, except as necessary to hold back the Trust Funds required by Section 4.7. Any such disbursements are for the actual costs of the Work performed and costs incurred to satisfy the Obligations, and cannot exceed the cost estimates shown in Schedule A. No disbursements will be given for amounts reimbursed to the Settlor by insurance proceeds.

4.2    **Partial Payments for Work Phase completion.** Interim payments for Work completed and accepted by Beneficiary shall be made. Upon Settlor's presentation to the Beneficiary of an executed contract for a phase of the Work as identified in the Plan, the Settlor shall be entitled, with the written concurrence of the Beneficiary (which concurrence shall not be unreasonably withheld or delayed), to receive one-half (1/2) of the sums allocated for such Work in Schedule A, which shall be released from the Trust Funds to the Settlor. Prepayment at the time of contracting for the first phase of Work identified in the Plan shall not exceed $165,750,000. Upon completion of a phase of the Work as identified in the Plan, the Settlor will provide Beneficiary a certificate executed by an Authorized Officer of Settlor verifying that the Work was conducted and costs incurred:

(a) To the best of the knowledge of the Settlor, in material compliance with all applicable federal laws and regulations (except to the extent that the Plan contemplates a variance from such laws and regulations);

(b) In compliance with the terms and conditions of the Leases (except to the extent that the Plan contemplates a variance from the terms and conditions in such Leases); and

(c) In conformance with the Plan.

Thereafter, the Settlor will be entitled, with the written concurrence of the Beneficiary that a phase of the Work has been completed (which concurrence shall not be unreasonably withheld), to a disbursement of the remaining one-half (1/2) of the sums associated with the completed Work in Schedule A, which shall be released from the Trust Fund to the Settlor. Prior to release of funds for completion of such Work, proof of full payment to all contractors may be required. Should Beneficiary agree to release such funds for payment for any Work performed by a contractor(s) but yet unpaid, the check(s) for the payment(s) may be issued jointly in the name of the Settlor and the contractor(s).

10

If the Beneficiary concurs that a phase of Work has been completed, the Beneficiary will advise the Trustee of this concurrence in writing within three (3) business days after Beneficiary's receipt of the certificate referenced above. The Trustee is hereby directed to allow withdrawals from the Trust Fund requested by the Settlor to which Beneficiary's written concurrence has been given without any further consent or requirement.

4.3   **Payment of Obligation Costs in Excess of the "Schedule A" Cost Estimates.** Individual costs incurred in the performance of Obligations in excess of the amounts shown on Schedule A shall be the full responsibility of the Settlor, and no Trust Funds shall be disbursed to cover any such costs.

4.4   **Interest Earned.** All interest accruing on Trust Funds will be (i) the sole property of and (ii) distributed quarterly to the Settlor.

4.5   **Final Certification of Completion of all Obligations.** Settlor will promptly certify to the Beneficiary in writing when all Obligations have been properly completed:

(a) To the best of the knowledge of the Settlor, in material compliance with all applicable federal laws and regulations (except to the extent that the Plan contemplates a variance from such laws and regulations);

(b) In compliance with the terms and conditions of the Lease(s) (except to the extent that the Plan contemplates a variance from the terms and conditions in such Lease(s)); and

(c) In conformance with the Plan.

Beneficiary will furnish its written concurrence (if Settlor has complied with the terms of this Trust Agreement) within thirty (30) business days after Beneficiary's receipt of the certification referenced above.

4.6   **Final Certification of Payment of Contractors.** When Settlor provides the Beneficiary the certification required by Section 4.5, Settlor shall also furnish Beneficiary with a certificate executed by an Authorized Officer of the Settlor listing all contractors, including names, addresses, telephone number, contact persons, and total amounts paid, certifying that all invoices associated with such Work have been fully paid and discharged.

Upon Beneficiary's written concurrence to release of the remaining Trust Funds, except as specified in Section 4.7, the Trustee shall be authorized to immediately release those funds to Settlor. Beneficiary's written concurrence will be promptly given if the Settlor has complied with all of the terms of this Trust Agreement.

11

Beneficiary will furnish written concurrence (if Settlor has complied with the terms of this Trust Agreement) within ten (10) business days after Beneficiary's receipt of the certification referenced above.

4.7    **Hold back of Trust Funds for Guarantee of Workmanship.**  Settlor agrees to a seven (7) year hold back of Trust Funds in an amount of $50,000,000 for potential residual Obligations associated with this Trust Agreement.  Three (3) years and 6 (six) months from the date of written acceptance by the Beneficiary of the verification of completion of the final Work identified in the Plan, and upon Beneficiary's written concurrence, the Trustee shall be authorized to release half of this hold back ($25,000,000) to the Settlor.  The Beneficiary's written concurrence will be promptly given if the Settlor provides written documentation that monitoring of all Work completed to date shows no detectable leakage.  The remaining balance of the held-back funds will be released to the Settlor at the end of seven (7) years from the date of written acceptance by the Beneficiary of the verification of completion of the final Work identified in the Plan.  These funds will serve as a cash reserve guarantee to fund any operations required due to a failure of completed Work following the certification required by Section 4.5.  An alternate form of guaranty such as a surety bond or risk insurance policy with the same protection to the Beneficiary as this Trust Agreement may be approved by Beneficiary at its sole discretion as a substitute for this hold back of Trust Funds.

4.8    **Event of Default.**  Any one (1) of the following events shall be an event of default attributed to the Settlor:

(a) The Settlor's failure, insolvency, application for adjudication in bankruptcy, or the filing of any application by or against Settlor for assignment, composition, extension or receivership.  In such an event, Settlor hereby authorizes, and at the instruction of the Beneficiary, the Trustee shall immediately assign, transfer and deliver the whole of any of the amounts herein pledged and deposited to Beneficiary, without recourse to judicial proceedings and without either demand, appraisal, advertisement or notice of any kind, all of which are hereby expressly waived.  For purposes of determining insolvency under this subsection, the calculation of Obligations will be reduced by the amount of Trust Funds.

(b) The Beneficiary has not received a true copy of the documentation submitted by Settlor which demonstrates that Settlor has completed the Work no later than ninety (90) days after the Work is scheduled to be completed in accordance with the Plan, unless the Beneficiary, in its sole discretion, approves an extension in this timeline before the end of the ninety (90) day period.  In determining whether to approve an extension, the Beneficiary may consider any force majeure condition, as defined by Section 6.10, that may have occurred or be continuing and unavailability of equipment beyond the control of the Settlor.

(c) The Settlor fails to comply with any material provision of this Trust Agreement.

The Beneficiary will notify the Settlor in writing in the event of (b) or (c).  Ten (10) business days after such notification, if Settlor has not undertaken the necessary measures to provide the documentation or comply with the provision, the Beneficiary may perform any uncompleted Work, at the risk and liability of the Settlor, and direct the Trustee to distribute to the Beneficiary the Trust Funds to pay or reimburse the Beneficiary for any expenses incurred or to be incurred in performing the Work.

The Trustee shall within one (1) business day of its receipt of notice and documentation of the expense incurred or to be incurred by Beneficiary, distribute funds to Beneficiary, or as otherwise directed by Beneficiary, to pay or reimburse to Beneficiary for expenses incurred or to be incurred to perform the Work.

In the event that the Settlor nonetheless completes the requirements of the Plan and satisfies the Obligations from other sources of funding, the Settlor shall recover such funds from the Beneficiary to the extent funds remain available after the Beneficiary utilizes the Trust Fund pursuant to the provisions of this Section.

4.9     **Audit of Settlor's Obligation Cost Records.**  Beneficiary shall have the right, at its own costs and expense, to audit Settlor's cost records relating to the Obligations in order to satisfy itself that Settlor has complied with this Trust Agreement.

13

ARTICLE V
Cost Estimates, Reviews, and Work Phases

5.1    **Cost of the Obligations.**  Individual costs by well, pipeline, facility, site clearance or any other pertinent obligation categories are described on Schedule A.

5.2    **Periodic Review of Obligations.**    Upon the Beneficiary's approval of completion of a phase of Work identified in the Plan, the Settlor may submit engineering specification information on the remaining wells and facilities identified on Schedule A to the Beneficiary and request the Beneficiary to reconsider its cost estimates for the Obligations to be applied to subsequent required funding of the Trust Agreement.  If the Settlor disagrees with the Beneficiary determination regarding this request, within thirty (30) calendar days, Settlor may submit independent engineering cost information to the Beneficiary at the Settlor's own expense.  Such information will be reviewed in good faith by the Beneficiary and a final determination on this request will be made by the Beneficiary at its sole discretion.

5.3    **Scheduling of Work**.  The Settlor will commence and diligently pursue to completion the Obligations at the earlier of the date:

   (a) Required by all applicable federal laws or regulations (except to the extent that the Plan contemplates a variance from such laws and regulations);

   (b) Required by the terms and conditions contained in the Leases (except to the extent that the Plan contemplates a variance from the terms and conditions in such Leases);

   (c) Provided in the Plan.

The Settlor agrees to submit its proposed Plan to the Beneficiary for approval within sixty (60) calendar days of funding of this Trust Account, unless the Beneficiary agrees in writing to a later submission date.  The Beneficiary shall have the obligation to act in good faith and reasonably in its review and approval of the Plan, giving full consideration to technical materials submitted and discussions held since issuance of the Supplemental Bond Order.  Upon the Beneficiary's approval (which shall be in writing), the Plan shall be an enforceable order pursuant to the Outer Continental Shelf Lands Act.

5.4    **Beneficiary Representatives Present During Work.**  The Settlor agrees that the Beneficiary may inspect the Work at such times that the Beneficiary deems in its sole discretion necessary and reasonable to ensure that the Work is being conducted in a manner in substantial furtherance of the Obligations.  The Settlor will provide the Beneficiary with at least a three (3) work-day advance notification of Work plan schedules, and the Beneficiary will provide the Settlor with a one (1) work-day advance notification of its intent to have inspectors on site for that Work.  When the Beneficiary

14

has provided this notice, the Settlor agrees to notify the Beneficiary as soon as possible whenever the scheduled Work is delayed or rescheduled.

## ARTICLE VI
## MISCELLANEOUS

6.1   **Notices.**  All notices, requests, demands, and other communications to or upon the respective parties hereto shall be in writing (including facsimile), and shall be deemed to have been duly given or made when delivered by hand, on the date shown on the receipt by a recognized overnight courier delivery service, or, in the case of delivery by mail, two (2) business days after the day deposited postage prepaid in the United States Mail, certified mail with return receipt requested and postage prepaid, or, in the case of faxed notice, when receipt thereof is acknowledged orally, by facsimile confirmation of pages delivered, or by written confirmation report by the party to whom it was addressed.  The addresses for all notices are as follows:

Trustee:

JPMorgan Chase Bank, N.A.
707 Travis Street, 11th Floor
Houston, Texas  77002   .
Attention:  Ms. Carol H. Rusciano
                     Vice President
Facsimile:  (713) 216-1370
Telephone:  (713) 216-4995

Settlor:

Taylor Energy Company LLC
1615 Poydras Street
5th Floor
Attention:  President
 Facsimile:  (504) 589-0411
Telephone:  (504) 581-5491
*New Orleans, LA 70112*

with copy to:

Liskow & Lewis
701 Poydras Street
Suite 5000
New Orleans, LA  70139
Attention:  Thomas Beron
 Facsimile:  (504) 566-5155
Telephone:  (504) 581-7979

16

Beneficiary:               United States of America
                           Department of the Interior
                           Minerals Management Service
                           Gulf of Mexico OCS Region
                           1201 Elmwood Park Boulevard
                           New Orleans, LA 70123-2394
                           Attention: Lars Herbst
                           Facsimile: 504-736-2630
                           Telephone: 504-736-2589

Any party may, by proper notice complying with this Section 6.1, change any and all parts of its address.

6.2    **Successors and Assigns.**  This Trust Agreement shall be binding upon and inure to the benefit of the Trustee, the Settlor, and the Beneficiary and their respective legal representatives, successors, and assigns.  The rights, duties, and obligations of the Trustee hereunder may not be transferred, assigned, or delegated by the Trustee except as expressly provided in this Trust Agreement.  The rights, duties and obligations of the Settlor hereunder may not be transferred, assigned or delegated by the Settlor without the prior written consent of the Beneficiary.

6.3    **Counterparts.**  This Trust Agreement may be executed by one or more of the parties to this Trust Agreement in any number of separate counterparts, and all of such counterparts taken together shall be deemed to constitute one and the same instrument.

6.4    **Number and Gender.**  Whenever the context requires, reference herein made to the singular shall be understood to include the plural; and likewise, the plural shall be understood to include the singular.  Words denoting sex shall be construed to include the masculine, feminine, and neuter, when such construction is appropriate; and specific enumeration shall not exclude the general but shall be construed as cumulative. Definitions of terms defined in the singular and plural shall be equally applicable to the plural or singular, as the case may be, unless otherwise indicated.

6.5    **Entire Agreement.**   This Trust Agreement, in conjunction with the Agreement to Provide Additional Bond, constitutes the entire agreement among the parties with respect to the subject matter and shall supersede any prior agreements, whether written or oral, among the parties.

6.6    **Invalidity.**  In the event that any one or more of the provisions contained in this Trust Agreement shall for any reason be held invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Trust Agreement.

17

6.7    **Titles of Articles and Sections.**  All titles or headings to articles or sections of this Trust Agreement are only for the convenience of the parties and shall not be used to interpret or construe this Trust Agreement.

6.8    **Termination.**  This Trust Agreement shall terminate upon the occurrence of either of the following conditions:

(a)    Mutual written agreement of the Settlor and Beneficiary; or

(b)    Settlor's compliance with all Obligations as evidenced by written concurrence of the Beneficiary.  If this Trust Agreement terminates upon the occurrence of this condition, the Trustee shall transfer all Trust Funds as directed by the Settlor.

6.9    **Governing Law and Jurisdiction.**  This Trust Agreement shall be governed by and construed in accordance with the laws of the State of Louisiana without giving effect to that state's conflicts of laws rules, but the parties consent to the jurisdiction of the federal courts to resolve any dispute arising under the Trust Agreement.

6.10.    **Force Majeure.**  The time periods outlined for performance under this Trust Agreement and the Plan will be suspended during periods where such non-performance is caused by or otherwise results from any act of God, governmental action, natural disaster, strike, terrorism, war, insurrection or other cause or circumstances beyond its control, which acts or occurrences make it impossible for such party to carry out its obligations under this Trust Agreement.

6.11    **Appeals.**  Decisions vested in the sole discretion of the Beneficiary shall be final decisions for the Department of the Interior and are not subject to further administrative review.

IN WITNESS WHEREOF, the parties hereto have caused this Trust Agreement to be duly executed and delivered by their proper and duly authorized officers as of the date first above written.

Trustee
    JPMorgan Chase Bank, N.A.

BY: *Carol H Rusciano*

Printed Name:  Carol H. Rusciano
Title:  Vice President


Settlor
    Taylor Energy Company LLC

BY: _____
Printed Name:  Phyllis M. Taylor
Title:  CEO


Beneficiary
THE UNITED STATES OF AMERICA, ACTING BY AND THROUGH THE MINERALS MANAGEMENT SERVICE OF THE UNITED STATES DEPARTMENT OF THE INTERIOR

BY: _____
Printed Name:  Lars T. Herbst
Title: Regional Director
       Gulf of Mexico OCS Region

19

IN WITNESS WHEREOF, the parties hereto have caused this Trust Agreement to be duly executed and delivered by their proper and duly authorized officers as of the date first above written.

**Trustee**
   JPMorgan Chase Bank, N.A.

BY: _____
Printed Name:  Carol H. Rusciano
Title:  Vice President

**Settlor**
   Taylor Energy Company LLC

BY: _____
Printed Name:  Phyllis M. Taylor
Title:  CEO

**Beneficiary**
THE UNITED STATES OF AMERICA,
ACTING BY AND THROUGH THE
MINERALS MANAGEMENT SERVICE OF
THE UNITED STATES DEPARTMENT OF
THE INTERIOR

BY: _____
Printed Name:  Lars T. Herbst
Title: Regional Director
       Gulf of Mexico OCS Region

19

<u>Schedule A</u>

**<u>Work Cost Estimates</u>**

Taylor Energy L.L.C. (Taylor) work plan and obligations under this Trust agreement will conform to MMS regulations contained in 30 CFR 250 Subpart Q - Decommissioning Activities and Subpart C- Pollution Prevention and Control for the decommissioning of Lease OCS-G 4935, Mississippi Canyon Block 20 (MC020) or meet the requirements under Part 250 for alternative procedures and departures. Both Taylor and MMS will perform analyses relative to decisions regarding the abandonment of Lease G04935 and the wells drilled from MC020 Platform A. MMS has previously made certain preliminary and below-stated lease abandonment assumptions only for the purpose of cost estimates and may validate those assumptions upon further analyses. But the preliminary assumptions are not to be construed as a final approval by MMS of the lease abandonment activity or as an approval of any departures from requirements in MMS regulations. A final decision on those potential departures will be made no later than April 30, 2008, after all required analyses, e.g. environmental, technical and legal, are completed. The decision is subject to appeal by Taylor.

**1. Permanently plug and abandon 25 wells drilled from Platform A located on Lease G04935 (MC020) in accordance with 30 CFR 250.1710 through 1717.**

The 25 wells include 19 wells drilled on lease G04935 (MC020), 5 wells drilled on Lease G15459 (MC021), and one well drilled on G15371 (SP073).

25 wells @ $25,500,000 per well

- MMS will consider a departure for 30 CFR 250.1716 in the requirement to "remove all wellheads and casings to at least 15 feet below the mud line." Under 30 CFR 250.1716(b), the District Manager may approve an alternate removal depth if "(2) You determine, and MMS concurs, that you must use divers, and the seafloor sediment stability poses safety concerns."

- MMS will consider departures on well plugs and how to plug wells under 30 CFR 250.1714 and 30 CFR 250.1715 pending approval of well intervention plans submitted by Taylor for the plugging and abandonment of wells drilled from Platform A in MC020.

- MMS will consider a departure for the permanent plugging and abandonment of three wells drilled from MC020 Platform A in accordance with 30 CFR 250.1710 through 1717. The three wells include Lease G04935, Wells A-5 and A-15, and Lease G15459, Well A-27.

20

**2. Remove the deck and flare boom from Platform A, MC020 in accordance with 30 CFR 250.1725 through 1730.**

$6,245,000

- MMS will consider a departure from 30 CFR 250.1728 in the requirement to "remove all platforms and other facilities (including templates and pilings) to at least 15 feet below the mud line." Under 30 CFR 250.1728 (b), the Regional Supervisor may approve an alternate removal depth if "(2) You determine, and MMS concurs, that you must use divers and the seafloor sediment stability poses safety concerns."

**3. Clear the seafloor of all other obstructions in accordance with 30 CFR 250.1740 through 1743.**

$6,535,000

**4. Remove decommissioned pipelines in accordance with 30 CFR 250.1750 through 1754.**

$3,000,000

- MMS has identified 6 pipelines that are permitted to Taylor that go to or depart from MC020 Platform A. All have approved applications to decommission the pipelines or part of a segment. Pipeline Segment Nos. 14667-14671 and 7296 (including SN 14993) will have to be decommissioned in accordance with the requirements in 30 CFR 250 Subpart Q and the approved applications. The MMS requirement specifically includes decommissioning the MC021 ends for Segment Nos. 14667-14671, which were never placed in service, and the complete decommissioning of Segment Nos. 7296 and 14993, which was the oil export line for MC020 Platform A.

**5. Remove contaminated soil in accordance with 30 CFR 250.300 (Subpart C - Pollution Prevention and Control).**

$13,000,000

**Schedule A, Total Cost Estimate:**

$666,280,000

21

## Schedule B

### Telephone Number(s) and signature(s) for
### Designated Officers to give and confirm  funds transfer instructions

If to the Settlor:

| Name | Telephone Number | Signature |
|------|------------------|-----------|
| 1.   Phyllis M. Taylor | (504) 581-5491 | |
| 2.   Robert E. Rose | (504) 581-5491 | |

If to the Beneficiary:

| Name | Telephone Number | Signature |
|------|------------------|-----------|
| 1.   Lars T. Herbst | (504) 736-2589 | |
| 2.   John L. Rodi | (504) 736-2589 | |

Telephone call backs shall be made to both the Settlor and the Beneficiary if joint instructions are required pursuant to the Trust Agreement.   All funds transfer instructions must include the signature of the person(s) authorizing said funds transfer.

22

## Schedule C

### Schedule of Fiduciary Fees

10 basis points (i.e., 0.10%) on the value of the Trust Funds to be charged and billed to the Settlor quarterly in arrears, immediately due and payable, and collected from an account designated by Settlor, with a minimum annual fee of $50,000. In addition to the above fiduciary fee, there may be additional costs or fees as are customarily charged on cash or cash equivalent investments to be held in the Trust Account.

AGREEMENT BETWEEN

TAYLOR ENERGY COMPANY LLC
AND THE
MINERALS MANAGEMENT SERVICE

TO IMPLEMENT ARTICLE IV-DISBURSEMENTS
OF THE MARCH 19, 2008 TRUST AGREEMENT


This Agreement outlines the procedures to carry out the disbursement provisions in Article IV of the March 19, 2008 Trust Agreement ("Trust Agreement") by and among JPMorgan Chase Bank, N.A., ("Trustee"), Taylor Energy Company LLC ("TEC" or "Settlor"), and the United States of America, acting by and through the Minerals Management Service of the United States Department of the Interior ("Beneficiary" or "MMS"). All defined terms in the Trust Agreement apply hereto.

The purpose of the Trust Agreement was to establish a secure source of funds for TEC to perform its obligations for Lease OCS-G 04935 (Mississippi Canyon Block 20), Lease OCS-G 15459 (Mississippi Canyon Block 21) and Lease OCS-G 16371 (South Pass Block 73). Sections 4.1 and 4.2 of the Trust Agreement describe the terms under which, upon notice from MMS to the Trustee, TEC can receive disbursements of Trust Funds as it undertakes its obligations. This Agreement details the procedures required for TEC and MMS to comply in a timely manner with presentation and payment of TEC's expenditures for obligations commenced or completed. Timely disbursement of Trust Funds is essential to TEC's ability to proceed with its obligations.

Section 4.2 of the Trust Agreement provides that "[u]pon Settlor's presentation to the Beneficiary of an executed contract for a phase of the Work as identified in the Plan, the Settlor shall be entitled, with the written concurrence of the Beneficiary (which concurrence shall not be unreasonably withheld or delayed), to receive one-half (1/2) of the sums allocated for such Work in Schedule A, which shall be released from the Trust Funds to the Settlor. Prepayment at the time of contracting for the first phase of Work identified in the Plan shall not exceed $165,750,000." Taylor submitted its draft Plan to MMS on May 19, 2008. Pursuant to the Plan, TEC will enter into contracts with vendors that may cover multiple phases of the work to be performed, and the costs for each phase will be tracked by a unique Authorization for Expenditure ("AFE") number assigned by TEC. TEC and MMS agree that the above-quoted $165,750,000 limitation applies to any individual AFE and not to the total of all requests for the first one-half payment under contracts/agreements for various obligations to be performed.

Example--as explained below, TEC may receive a $12,750,000 disbursement for the initial one-half cost for each well. After well #13, the cumulative total of the first-half payments will exceed $165,750,000. In this example, the limitation in Section 4.2 shall not be construed to limit TEC's right to obtain disbursement for $12,750,000 in costs when it commences well #14 and subsequent wells.

EXHIBIT
2

I. Well Decommissioning

To implement the provisions of Section 4.2 of the Trust Agreement relating to well decommissioning. TEC and MMS agree that TEC may submit requests for disbursement as follows:

    A. <u>Drilling rig costs</u>. At the time that TEC executes a contract for a drilling rig, thereby becoming legally bound to make all payments required under that contract, it may submit a request for disbursement of one-half of the cost for the drilling rig for the full term of the contract.

    Example--drilling rig contract is for 365 days at a cost of $285,000 per day, totaling $104,025,000. Upon contract execution, TEC is entitled to disbursement from Trust Funds in the amount of $52,012,500.

To avoid any double disbursement as individual well operations are commenced, the costs for the drilling rig initially will be allocated based upon 50 days for each well (the number of days used to establish the Work Cost Estimates in Schedule A of the Trust Agreement). Therefore, in the above example, the total cost initially allocated per well is 50 days x $285,000/day. The one-half that TEC will have been reimbursed per well upon drill rig contract execution thus equals 50 days x $142,500/day = $7,125,000. This sum is referred to hereinafter as the Rig Allocated Cost and will reduce the one-half disbursement request for individual wells pursuant to Subsection I.B. by that amount.

    B. <u>Other well costs</u>. Pursuant to Schedule A of the Trust Agreement, the work estimate is $25,500,000 per well. At the time that TEC begins operations for an identified well, it may present to MMS its AFE for that well and a request for disbursement of the difference between the Rig Allocated Cost for that well and $12,750,000 (one-half of the Work Cost Estimate in Schedule A).

    C. <u>Final Payment</u>. At the time TEC completes its obligations for a well, it may present to MMS a request for disbursement for the difference between $12,750,000 and the lesser of $25,500,000 or its total costs for that well. Total cost for a well will be based on the actual number of days that the drill rig operated on that well, subject to later adjustment pursuant to Subsection I.D.

    D. <u>Adjustments</u>.

    1. At the conclusion of each rig contract, if TEC must pay the daily rig fee for any days that the rig did not actually operate, TEC will allocate the actual cost of the rig contract on an equal proportionate basis to each day the rig operated on a TEC well under that same rig contract. For each well completed, TEC may claim an additional disbursement for the daily rig fee for each day the rig operated on that well, *provided*, that the total disbursement for any well shall not exceed $25,500,000.

2

Example 1--the rig contract cost is $285,000 per day for 365 days. TEC completes a well operation on day 345 and there are only 20 days remaining before the contract terminates and the rig must be moved off-site (due to commencement of peak hurricane season). TEC and MMS agree that no further well operations should be commenced because the remaining 20 days is inadequate to complete any beneficial work. In this circumstance, TEC is obligated under its time-based contract to pay the drill rig contractor for the 20 days when the rig is idle and not operating on any well. TEC may allocate the $5,700,000 paid to the drill rig contractor for the idle days as part of the actual cost for the days that the rig operated on TEC wells under that contract, at the rate of $16,522/day ($5,700,000 divided by 345). If the rig operated on well #1 for 45 days, and TEC already has submitted its Certification for Payment for that well and received its disbursement, TEC may request a supplemental disbursement from the Trust Funds for an additional $743,490 (45 days x $16,522), provided the total disbursement for well #1 does not exceed $25,500,000.

Example 2--same as Example 1 except that the drill rig contractor sublets the rig to another operator for the 20-day balance of the contract period and TEC is not required to pay for those days. No adjustment would be made for the per-day rig cost for each day the rig actually was used for well #1.

2. If after receiving a disbursement for one-half the cost of any operation, TEC, with MMS' written concurrence, suspends work on that operation and does not expect to resume the operation within the next 90 days, TEC will re-deposit any funds it has not expended for that operation into the Trust Account, subject to later disbursement if operations resume. If, however, TEC has expended more than one-half of the cost of the operation when work is suspended, it may receive a disbursement for all work performed, provided that the total disbursement shall not exceed the Work Cost Estimate for that operation established in Schedule A of the Trust Agreement.

Example 1--TEC requests the initial one-half disbursement of $12,750,000 to plug and abandon well #5. Ten days into the operation TEC encounters a problem that TEC and MMS agree permanently prevents any further operations on that well. If TEC has expended $8,000,000 for work up to the date operations on well #5 are terminated, it will re-deposit $4,750,000 into the Trust Account. If circumstances change and TEC later resumes operations on that well, it may request disbursement of the $4,750,000 balance of the initial one-half disbursement when it resumes operations plus, when TEC submits its Certification for Payment pursuant to Section V.B.2., any amounts subsequently expended up to a total of $25,500,000 for that well.

Example 2--same as Example 1 except that the problem encountered does not permanently prevent further operations. If TEC expects to resume operations on that well in 75 days, it is not required to re-deposit the $4,750,000 into the Trust

Fund. However, if TEC does not expect to resume operations on that well for 120 days, it must make the re-deposit and may then request its repayment when the operations resume.

Example 3--same as Example 1 except that TEC has expended $15,000,000 when operations cease. TEC may present to MMS a request for an additional Trust Fund disbursement of $2,250,000 when the work on well #5 is permanently terminated.

3. Any request for disbursement under Section I of this Agreement is subject to the limitation in Subsection V.B.5.


II.      Pipeline Decommissioning

To implement the provisions of Section 4.2 of the Trust Agreement relating to pipeline decommissioning, TEC and MMS agree that TEC may submit requests for disbursement as follows:

A. Pipeline decommissioning costs. Pursuant to Schedule A of the Trust Agreement, the work estimate for this phase is $3,000,000. Once TEC begins this phase, it may present to MMS its AFE and a request for disbursement of $1,500,000 (one-half of the Work Cost Estimate in Schedule A). If TEC enters into a contract for a vessel or other equipment for pipeline decommissioning, requests for disbursement will follow the same procedures set out for well decommissioning expenses pursuant to Section I of this Agreement.

B. Final Payment. At the time TEC completes its obligations for this phase, it may present to MMS a request for disbursement for the difference between $1,500,000 and the lesser of $3,000,000 or its total costs for this phase.

C. Adjustments.

1. If after receiving a disbursement for one-half the cost of any operation, TEC, with MMS' written concurrence, suspends work on that operation and does not expect to resume the operation within the next 90 days, TEC will re-deposit any funds it has not expended for that operation into the Trust Account, subject to later disbursement if operations resume. If, however, TEC has expended more than one-half of the cost of the operation when work is suspended, it may receive a disbursement for all work performed, provided that the total disbursement shall not exceed the Work Cost Estimate for that operation established in Schedule A of the Trust Agreement.

2. Any request for disbursement under Section II of this Agreement is subject to the limitation in Subsection V.B.5.

4

III.    Platform Decommissioning

To implement the provisions of Section 4.2 of the Trust Agreement relating to platform decommissioning, TEC and MMS agree that TEC may submit requests for disbursement as follows:

A. Platform decommissioning costs. Pursuant to Schedule A of the Trust Agreement, the work estimate for this phase is $6,245,000. Once TEC begins this phase, it may present to MMS its AFE and a request for disbursement of $3,122,500 (one-half of the Work Cost Estimate in Schedule A). If TEC enters into a contract for a vessel or other equipment for platform decommissioning, requests for disbursement will follow the same procedures set out for well decommissioning expenses pursuant to Section I of this Agreement.

B. Final Payment. At the time TEC completes its obligations for this phase, it may present to MMS a request for disbursement for the difference between $3,122,500 and the lesser of $6,245,000 or its total costs for this phase.

C. Adjustments.

1. If after receiving a disbursement for one-half the cost of any operation, TEC, with MMS' written concurrence, suspends work on that operation and does not expect to resume the operation within the next 90 days, TEC will re-deposit any funds it has not expended for that operation into the Trust Account, subject to later disbursement if operations resume. If, however, TEC has expended more than one-half of the cost of the operation when work is suspended, it may receive a disbursement for all work performed, provided that the total disbursement shall not exceed the Work Cost Estimate for that operation established in Schedule A of the Trust Agreement.

2. Any request for disbursement under Section III of this Agreement is subject to the limitation in Subsection V.B.5.

IV.    Other Obligations

To implement the provisions of Section 4.2 of the Trust Agreement relating to clearing the sea floor of obstruction and removing any contaminated soil, TEC and MMS agree that TEC may submit requests for disbursement as follows:

A. Sea floor and soil clean up costs. Pursuant to Schedule A of the Trust Agreement, the work estimates for these phases are $6,535,000 and $13,000,000, respectively. At the time that TEC begins each phase, it may present to MMS its AFE and a request for disbursement of $3,267,500 and $6,500,000, respectively (one-half of the Work Cost Estimate in Schedule A for each phase).

Case 1:16-cv-00012-NBF   Document 1   Filed 01/04/16   Page 74 of 77

B. Final Payment. At the time TEC completes its obligations for each of these phases, it may present to MMS a request for disbursement for the difference between $3,267,500 and the lesser of $6,535,000 or its total costs for the sea floor cleaning phase, or it may present to MMS a request for disbursement for the difference between $6,500,000 and the lesser of $13,000,000 or its total costs for the soil cleaning phase.

C. Adjustments.

1. If after receiving a disbursement for one-half the cost of any operation, TEC, with MMS' written concurrence, suspends work on that operation and does not expect to resume the operation within the next 90 days, TEC will re-deposit any funds it has not expended for that operation into the Trust Account, subject to later disbursement if operations resume. If, however, TEC has expended more than one-half of the cost of the operation when work is suspended, it may receive a disbursement for all work performed, provided that the total disbursement shall not exceed the Work Cost Estimate for that operation established in Schedule A of the Trust Agreement.

2. Any request for disbursement under Section IV of this Agreement is subject to the limitation in Subsection V.B.5.


V.     Disbursement Procedure

A. TEC requests for disbursement.

1. TEC will submit all requests for disbursement to the MMS Gulf of Mexico Regional Office Leasing Program Manager, with a copy to the Supervisor, Leasing Sales and Support Unit. Requests for disbursement for initial one-half payments for work under the Plan shall be submitted by an authorized officer of TEC. When the work pursuant to any AFE is completed, TEC will submit a Certification for Payment, executed by an authorized officer of TEC, stating that the work is complete and the total amount of costs incurred, in accordance with the requirements of Sections 4.2(a)-(c) and 4.5(a)-(c) of the Trust Agreement:

   a.  To the best of the knowledge of the Settlor, in material compliance with all applicable federal laws and regulations (except to the extent that the Plan contemplates a variance from such laws and regulations);
   b.  In compliance with the terms and conditions of the Leases (except to the extent that the Plan contemplates a variance from the terms and conditions of such Leases); and
   c.  In conformance with the Plan.

TEC will provide documentation, including copies of checks or proof of electronic payment to vendors, to support each request for disbursement of Trust Funds when the work pursuant to any AFE is completed.

6

TEC shall provide to MMS in writing a list of the names of TEC officers authorized to request disbursement pursuant to this section. TEC may, as necessary, in writing amend the list of authorized officers.

2. TEC may submit disbursement requests to the MMS Gulf of Mexico Regional Office Leasing Program Manager, with a copy to the Supervisor, Leasing Sales and Support Unit, only on the first and third Monday of each month (or the next business day if the office is closed for official business) either via e-mail, by delivering a CD with electronic images of all relevant documents, or by depositing all documents in a secure electronic storage area that the MMS can access via a password.

B.  <u>MMS processing of disbursement requests.</u>

1. Within three business days of receiving a complete request for an initial one-half payment (in accordance with Section 4.2 of the Trust Agreement, including supporting documentation) pursuant to this Agreement, MMS shall either provide written concurrence to the Trustee to disburse the applicable funds to TEC, or MMS shall notify TEC's Chief Financial Officer (by e-mail) what information TEC must provide to obtain that concurrence. MMS shall provide the concurrence determination to the Trustee within three business days of receiving the additional information from TEC.

2. (i) Within three business days of receiving a complete Certification for Payment (in accordance with Sections 4.2, 4.5 and 4.6 of the Trust Agreement, including supporting documentation and proof of full payment to all contractors) executed by an Authorized Officer of TEC, MMS shall either concur that the work subject to the payment request has been completed, or MMS shall notify TEC's Chief Financial Officer (by e-mail) what information MMS requires to make that concurrence determination. MMS shall make the concurrence determination within three business days of receiving the additional information. (ii) MMS shall provide written notice to the Trustee to disburse the applicable funds within three business days of making its determination under paragraph (i) that the work has been completed.

3. If TEC submits a request for disbursement that includes multiple contracts or multiple payments to vendors, and MMS requests additional information from TEC pursuant to Subsection B.1. or B.2. for only some of those contracts or payments, MMS shall approve for disbursement within the time prescribed in this Subsection that portion of the request for disbursement for which it is not requesting additional information (and, for disbursements under Subsection B.2., for which MMS can determine that the portion of the work is complete).

Example 1--TEC submits a Certificate for Payment for Well #1 that includes invoices from five vendors. MMS concurs that the work is complete, but MMS needs more information regarding the payment to vendor #5. MMS must provide approval to the Trustee within three business days to make a disbursement for the costs associated with the first four invoices while it engages in the process of obtaining the additional information for vendor #5.

7

Example 2--Same as Example 1 except that MMS needs the information for
vendor #5 before it can determine that invoices for vendors #1-4 should be paid.
In this situation, MMS may wait for the information regarding vendor #5 before it
approves payment of any of the invoices.

4. Notwithstanding any other provision of this Agreement to the contrary,
TEC and MMS may agree to any other procedure for processing a request for disbursement of
Trust Funds that is not inconsistent with the provisions of the Trust Agreement.

5. Any disbursement under this Agreement shall be limited by Section 4.7
of the Trust Agreement.

C. Payment procedure.

Funds authorized for disbursement shall be released from the JPMorgan MMS Trust #1
account as follows:

1. In the case of an electronic transfer - to a Settlor account also held at
JPMorgan – Taylor Energy Co LLC- Cash Account.

2. In the case of funds issued jointly to Settlor and an unpaid contractor,
then mailed to:
Taylor Energy Company LLC
1615 Poydras Street, Suite 500
New Orleans, Louisiana 70112

Agreed to this 20ᵗʰ day of November, 2008:


Robert E. Rose
Taylor Energy Company LLC

Lars T. Herbst
Regional Director
MMS Gulf of Mexico OCS Region


John Rodi
Deputy Regional Director
MMS Gulf of Mexico OCS Region

8



EXHIBIT
3