EXHIBIT P



United States Department of the Interior

BUREAU OF SAFETY AND ENVIRONMENTAL ENFORCEMENT
Gulf of Mexico OCS Region
1201 Elmwood Park Boulevard
New Orleans, LA 70123-2394

In Reply Refer To: GE 432A

May 11, 2015

FEDERAL EXPRESS NO. 8024 5260 9603

Mr. William W. Pecue, III
President, Taylor Energy Company, LLC
One Lee Circle
New Orleans, Louisiana 70130

Dear Mr. Pecue:

On March 21, 2014, the Bureau of Safety and Environmental Enforcement (BSEE), one of the successor agencies to the Minerals Management Service (MMS), of the U.S. Department of the Interior, received a request from Taylor Energy Company, LLC (Taylor) for a departure from BSEE's decommissioning and pollution control regulations, or permission to use alternate procedures, at the MC-20 site.[1] The request replaced a March 24, 2010, departure request that was later withdrawn by Taylor in 2012. This letter constitutes BSEE's denial of Taylor's March 21, 2014, request for departure or approval of alternative procedures (Request).

Background

Taylor's Request arose out of an unfortunate set of circumstances in which a mudslide, initiated during Hurricane Ivan, toppled Taylor's Mississippi Canyon Block 20 Platform A and resulted in the facility resting on the seafloor approximately 550 feet down slope and southeast of its original location. The oil and gas platform owned by Taylor had a total of 28 wells drilled from the structure, with bottom-hole locations on Leases OCS-G 4935 and 15459, Mississippi Canyon Blocks 20 and 21, respectively. Simultaneously with the destruction and movement of the platform and the attendant bending and twisting of the well components, the conductors and wellheads were covered by the subsea mudslide and buried under approximately 69-150 feet of mud and sediment. Following the toppling of the platform, an oil sheen started to appear on the water surface in the area of the wells, which was eventually linked to the MC-20 site.

There are 25 wells remaining at the MC-20 site for which Taylor has retained decommissioning obligations pursuant to the regulations at 30 C.F.R. Part 250, Subpart Q.[2] Decommissioning, as

---

[1] The subject line in Taylor's March 21, 2014, letter describes its request as: "Taylor Energy Company's Departure Request for Remaining 16 Wells at MC-20, Request for Departure or Alternate Procedure to Allow use of Taylor's Undersea Containment System, and Request for Departure or Alternate Procedure for Contaminated Sediments."
[2] Three of the wells had been temporarily abandoned before the toppling of the platform, and MMS deemed them permanently plugged and abandoned, based on an alternate compliance determination, pursuant to 30 C.F.R. § 250.141.

prescribed in the regulations, includes the removal of the platform and other facility components, removal or treatment of any contaminated soil, clearing the seafloor of debris, decommissioning pipelines, and permanently plugging and abandoning all wells.

In 2008, Taylor entered into a trust agreement with the United States to cover well plugging, site clearance, and corrective action obligations for the MC-20 Platform A and the 25 wells (Trust). The terms of the Trust allocate specific amounts of money from the Trust to be used to reimburse Taylor for expenses incurred in the decommissioning of the MC-20 site.

Taylor investigated "normal" top-hole abandonment procedures of the 25 wells, but this proved infeasible at the time due to the large volume of unstable mud and the imprecise location of the wellheads after the destruction caused by the hurricane. As a result, Taylor sought to plug and abandon certain high-risk wells by drilling intervention wells (sometimes referred to herein as IW).[3] With the concurrence of the Unified Command (UC), BSEE granted certain departures from the regulations, allowing intervention well drilling to proceed. As of today, 9 intervention wells have been drilled and plugging material, such as cement or resin, has been used in the attempt to plug 9 of the high-risk wells,[4] leaving 16 wells still to be plugged and abandoned by Taylor.

When Taylor drilled the nine intervention wells in an attempt to plug and abandon nine of the original wells, it chose those wells from which, in its estimation, hydrocarbons were most likely to flow. As Taylor conducted the intervention of these wells, the number of plume sites decreased. Taylor was also instructed by the UC to construct and place containment domes and related equipment over three hydrocarbon plumes emanating from the seafloor, and to collect the flowing hydrocarbons, in order to minimize environmental effects. Taylor reduced the number of plumes, but even after the drilling of the intervention wells, and the placement of the containment equipment, which is no longer operational, there continues to be an oil sheen on the sea surface. In fact, the average reported daily oil volume on the sea surface over the past seven months has been over two barrels. For more than 75 days, the volume was greater than 1 barrel, which includes 23 days of volume greater than 3.8 barrels and 4 days greater than 35 barrels.

Taylor's Departure Request for the Remaining 16 Wells at MC-20

Taylor seeks a departure, pursuant to 30 C.F.R. § 250.142, from the regulations requiring permanent plugging and abandonment of the remaining 16 wells.[5] Relying on the reasoning of its experts, Taylor maintains that 14 of the remaining 16 wells have no future flow potential, and two have a minimal flow potential. To support this reasoning, Taylor cites many factors that are discussed in the supporting documents for the Final Risk Assessment and Cost Estimate workshop held on March 25 and 26, 2014, including insufficient bottom-hole pressure, water influx displacing the hydrocarbons in the reservoir(s) as the reservoir(s) become depleted, low

---

[3] High risk in this instance means a well that may be polluting, or has the highest potential to pollute, by allowing the flowing, leaking, or seeping of hydrocarbons.

[4] Wells A-1 (IW 1), A-11 (IW 11), A-19 (IW 19), A-17 (IW 17), A-21 (IW 21), A-4 (IW 4), A-10 (IW 10), A-13 (IW 13), and A-16 (IW 16).

[5] Wells A-2, A-3, A-6, A-7 ST, A-8, A-9 ST, A-12/A-12D, A-14 ST, A-18, A-20, A-22, A-23, A-24, A-25, A-26, and A-28.

productivity, the existence of mechanical plugs in the tubing string, seawater influx into the wellbore with concomitant increase in the hydrostatic gradient, and plugging, and eventual sealing, of the wellbore with sediment carried by the seawater.

The Request asserts that any further attempt to plug these wells using intervention wells is both unnecessary and dangerous. Additionally, Taylor asserts that serious risks and extraordinary costs associated with the intervention on the remaining 16 wells outweigh any potential benefit.

BSEE Response

The BSEE is authorized to grant a departure from its regulations pursuant to 30 C.F.R. § 250.142. The regulations, however, provide no criteria to be used in determining whether to grant a departure. Therefore, the determination is based on the facts of each case and is within BSEE's discretion.

Taylor has requested a departure from the "operating requirements" of permanently plugging and abandoning 16 wells on Mississippi Canyon Blocks 20 and 21, but has failed to demonstrate that such a departure is warranted at this time. As is evident from the continuing pollution and surface oil sheen in the area of the wells in question, hydrocarbons are still escaping the seafloor and entering the environment. Taylor has asserted that these hydrocarbons are escaping from contaminated sediment that will eventually be covered with more sediment, ending the hydrocarbon escape. Taylor, however, has provided no clear evidence to support its assertion that the hydrocarbons are coming from contaminated sediment and not from leaking or unplugged wells. Nor is there any way to predict whether, in the future, sufficient mud/sediment will ever be deposited to seal ongoing or future flow, leaks, or seepage. Further, there is the possibility that, in this unstable region, mud could be removed from the area, rather than deposited, leaving less mud and sediment cover over any open/leaking/flowing unplugged wells.

Taylor's unsubstantiated theory of the origin of the continually flowing hydrocarbons is tied to its claim that these wells, or at least 14 of them, are not now flowing, leaking, or seeping, and have no future flow potential. This claim, even if correct, and BSEE does not believe it is correct, applies only to the current completions in each well and does not apply to other formations in each wellbore. This is particularly apparent at this time given that hydrocarbons are still appearing and causing pollution in the area of the wells. Taylor's Departure Request of March 24, 2010, candidly admits, throughout its length, that there are many unknowns concerning these unplugged wells and their fitness after the destruction wrought by Hurricane Ivan. Essentially, the integrity of each part of each of the 16 wells is unknown, and weaknesses or failures of any of these parts could cause, and may now be causing, leaks, seeps, or flows of hydrocarbons.

Moreover, concerning the nine wells for which intervention wells have been drilled, it is uncertain whether the intervention well process succeeded in properly plugging and abandoning the completions in those nine wells. Taylor relies heavily on its claim that further attempts to plug and abandon the remaining 16 wells will do more harm than good, and at an unprecedented, and unforeseen, cost. The BSEE agrees that there may be risks associated with further intervention, and that the costs are high, but there is no way to know whether, in the future,

hydrocarbons in significant quantities could flow from the 16 unplugged wells, or even from the 9 wells for which intervention wells were drilled.

Specifically, Taylor has not addressed the following issues sufficiently to persuade BSEE that a departure is warranted at this time: (1) the origin of current and ongoing pollution occurring at the site; (2) the prediction of future flow in the remaining open reservoirs penetrated by the 16 unplugged wells (particularly due to the potential for future re-pressurization of the reservoirs); (3) gravity segregation of the hydrocarbons in the wellbore, assuming it fills with seawater to reservoir depth; (4) the potential for the subsurface safety valve (and other well parts) to fail; and (5) the sufficiency of the evidence supporting the assumption that the wellbores are, and will remain, permanently plugged and sealed with sediment. Thus, granting a departure, and absolving Taylor of its plugging and abandonment obligations, is not in the best interests of the environment or the United States, and BSEE denies Taylor's request for a departure from the requirement to plug and abandon the 16 unplugged wells.

Taylor's Request for Departure or Alternate Procedure to Allow Use of Taylor's Undersea Containment System

Concerning unanticipated hydrocarbon discharges, Taylor requests that BSEE grant a departure from its decommissioning regulations or approve an alternate procedure or equipment use that would authorize the use of subsea containment systems as a means to capture such discharges. Taylor alleges that its current undersea containment system has the ability to capture any unanticipated discharges that may occur.

BSEE Response

As discussed above, the decision whether to grant a departure is based on the facts of each case and is within BSEE's discretion. As for an approval of alternate procedures, such procedures "must provide a level of safety and environmental protection that equals or surpasses current BSEE requirements." 30 C.F.R. § 250.141. As directed by the United States Coast Guard (USCG) and BSEE, Taylor Energy installed subsea pollution containment domes to collect leaking hydrocarbons from plumes emanating from areas around the well bay and the ends of the bent and damaged conductors. The domes were installed during the initial intervention well drilling phase.

While those domes contained some of the hydrocarbons emanating from the MC-20 site, there were operational issues, including sinking into the seafloor, which rendered them less than optimally-functional. At present, none of the domes are operational. In 2012, the USCG Federal On-Scene Coordinator ordered Taylor to install new subsea containment equipment to address the continuing spill at the site. Taylor, however, has not yet deployed such equipment, and as noted above, there is a substantial oil sheen on the sea surface at and near the site.

Because Taylor has failed to demonstrate that its subsea containment system is capable of controlling ongoing leaks at the MC-20 site, BSEE declines to grant a departure from the regulations to allow Taylor to rely on containment in lieu of further decommissioning. Moreover, since Taylor has been unable to demonstrate that its subsea containment system is capable of preventing further continuing discharges of oil from the site, BSEE concludes that

that system does not provide a level of environmental protection that equals or surpasses current BSEE requirements. Thus, Taylor's request to rely solely on its subsea containment system is hereby denied.

Taylor's Request for Departure or Alternate Procedure for Contaminated Sediments

Taylor's final request is that it be allowed to leave any contaminated sediments in place and permit natural sedimentation to form a "cap" over the contaminated sediments. In support of this request, Taylor cites a 2009 Site Specific Environmental Assessment (SSEA) conducted by BSEE's predecessor (MMS) that relied on Taylor's proposal to leave the contaminated soil in place because of the increased exposure risks that would likely result from excavation and transportation of the contaminated materials through the water column.

BSEE Response

Notwithstanding the fact that the SSEA recommended implementation of Taylor's proposal to leave in place the contaminated soil, MMS never finally accepted this recommendation and never finally decided that Taylor's proposal should be adopted. The SSEA was focused on environmental impacts and did not consider or discuss the possible future need to remove the contaminated soil in order to reach the still-vertical portions of the wellbores to perform more conventional decommissioning. Furthermore, a recommendation in an SSEA cannot abrogate the requirement that Taylor perform corrective action under 30 C.F.R. § 250.300, and Schedule A in the Trust contemplated such corrective action to be the removal of the contaminated soil. The BSEE, therefore, declines to grant a departure from its pollution prevention and control regulations. For these same reasons, BSEE also declines to grant an approval of alternate procedures that would allow the contaminated sediment to remain permanently in place without the option to require Taylor to remove it at some point in the future should such removal become necessary.

In conclusion, given the continuing discharge of oil from the MC-20 site, Taylor's inability to contain the discharge, and the possibility that future plugging and abandonment work and/or the removal of contaminated sediments, may be required, BSEE denies Taylor's Request. This decision may be appealed pursuant to 30 C.F.R. Part 290. If you elect to appeal, a Notice of Appeal must be filed with this office and served on the Associate Solicitor, Division of Mineral Resources, within 60 days of receipt of this letter (see NTL No. 2009-N12). If you have any questions, please contact Mr. Michael Prendergast at (504) 736-2680 or by email at michael.prendergast@bsee.gov.

Sincerely,

Lars Herbst
Regional Director